## MAGNOLIA PETROLEUM CO. et al. v. PRICE et al.

No. 12243—Opinion Filed March 21, 1922.

Rehearing Denied May, 2, 1922.

(Syllabus.)

1. Public Lands — Re-Leasing Oklahoma Lands—Preference Rights—Statutes.

The act of Congress, March 3, 1891, 26 Stat. L. 1026, does not provide for a preference right to re-lease the public lands of the territory, nor do any subsequent acts pertaining to the subject prior to the passage of the Enabling Act, provide for the re-leasing of such lands, nor for a preference right to the original lessee.

**2. Same—Purpose of Reservation from Settlement.**

The moving and expressly designated purpose set forth in the various acts of Congress, pertaining to the public lands which were reserved for the future state, was that sections 16 and 36 of each township should constitute a permanent school fund for the common school; that section 13 in each township, in the portions of the state where sections 13 and 33 were reserved from settlement, was reserved for university and other school purposes, and section 33 reserved for public building purposes; and no other purpose is given by Congress for reserving said lands from settlement except the designated purposes mentioned.

**3. Same—Re-Leasing—Preference Right of Lessee.**

After the approval of the act of March 3, 1891, supra, the Secretary of the Interior made a rule, of which the following is the pertinent part: "In case a new lease is made at the end of the third year, the preference right shall be given the former lessee." Held, this did not grant to the lessee the right to lease in perpetuity, but merely granted a preference right to re-lease under conditions prescribed in case the territory chose to re-lease such lands.

**4. Same—Grant of Lands to State—Effect —Constitution.**

The grant of lands, to wit, sections 16 and 36 for common school purposes, section 13 for the support of higher institutions of learning, and section 33 for the purpose of public building, and the acceptance of such lands by the state by express provision of the Constitution, constituted a complete contract and compact between the government of the United States and the state of Oklahoma, and supersedes all previous acts, rules, and regulations in conflict therewith.

**5. Same—Enabling Act—Limitations Upon Sale by State.**

Said act of Congress, known as the Enabling Act, did not impose upon the state the obligation to sell said lands, or any of them, but merely provided that if sold they should be sold in the manner provided for in the grant and acceptance by the Constitution.

**6. Same.**

The state could have had it so elected, retained said lands, and all of them, as a permanent fund for the respective purposes for which they were granted, and never sold any of them at any time, and yet not violated any condition of the grant.

**7. Same—Limitations Upon Leasing.**

Neither was the state obliged to lease any of said lands beyond the conditions expressed in the Enabling Act and accepted under the Constitution.

**8. Same—Rights Under Leases Antedating Statehood.**

Lessees, holding under leases granted prior to statehood, have no rights under the lease except those expressly provided for in the Enabling Act, the Constitution, and the statutes of Oklahoma, and the terms of their lease contract.

**9. Oil and Gas—Rights of Agricultural Lessee of State Land.**

Neither under the conditions of the Enabling Act, the provisions of the Constitution, nor the terms of the lease contract involved here, is the agricultural lessee, defendant in error, W. T. Price, entitled to the oil and gas and other minerals in said land until same is conveyed to him by the state, nor has he power to force the state to convey same to him until the state elects to do so.

**10. Same—Validity of Oil and Gas Lease on Public Lands.**

The oil and gas lease herein granted to the Magnolia Petroleum Company by the Commissioners of the Land Office is not in conflict with the conditions of the grant, nor the acceptance thereof, nor with the statutes of Oklahoma, and is a valid lease.

**11. Same—Rights of Agricultural Lessee.**

The defendant in error W. T. Price is not authorized to interfere with the operation of said oil and gas lease, but is entitled to whatever damages he may sustain to the operation of his agricultural lease by reason of the operation of such oil and gas lease.

Error from District Court, Stephens County; Cham Jones, Judge.

Injunction by the Magnolia Petroleum Company against William T. Price and another to prevent interference with drilling operations on state land; the State, through the School Land Commissioners, intervening. Judgment for defendants, and plaintiff and interveners bring error. Reversed.

W. H. Francis, B. B. Blakeney, and Hubert Ambrister, for plaintiff in error Magnolia Petroleum Company.

S. P. Freeling, Atty. Gen., C. W. King, Asst. Atty. Gen., and Geo. E. Merritt, for the State.

Stevens & Richardson, Stuart, Sharp & Cruce, and Blake & Boys, for defendant in error W. T. Price.

HARRISON, C. J. This suit grew out of a controversy between the Magnolia Petroleum Company, which owns an oil and gas lease on the N. E. 1/4 of sec. 33, twp. 1, S. of R. 8, W. I. M., and W. T. Price, who owns an agricultural lease on the same land.

Under its lease the Magnolia Petroleum Company sought to go upon the land and drill for oil and gas. Price sought to pre-

vent the Magnolia Company from drilling, and refused to allow its employes to enter upon the land for drilling purposes, he, Price, being in possession under his agricultural lease and claiming the right to all the oil and gas by virtue of such lease.

On May 25, 1920, the judge of the district court being absent from the county, the Magnolia Company applied to and was granted a temporary order by the county judge, restraining Price from interfering with the Magnolia Company's drilling operations, and thereafter, on June 4th, the judge of the district court, having returned to the county, continued said order in force until June 22nd, and it seems that such order remained in force until March, 1921, and that the Magnolia Company, operating under such order, had drilled some five or six producing wells, from which it had taken vast quantities of oil.

On November 18th, Price filed his answer to the Magnolia Company's amended petition, claiming the oil and gas by virtue of his agricultural lease and preference right under the law to purchase, and prayed for an accounting for the oil and gas the Magnolia Company had taken from the land.

Before the case was finally disposed of the state intervened through the Commissioners of the Land Office and the Attorney General, claiming that the title to said lands and the mineral rights were still in the state, and that it had executed a valid oil and gas lease to the Magnolia Company and was entitled to its royalties therefrom for the benefit of the state, section 33 having been reserved by acts of Congress, by the Enabling Act, and the Constitution for public building purposes.

The case was not disposed of by the district court until March, 1921, at which time the temporary restraining order which had been in force since May, 1920, was dissolved and judgment rendered in favor of Price; Price being adjudged to be the owner of all oil and gas and other mineral rights by virtue of his preference right to purchase when the land should be sold, and the state and Magnolia Company being perpetually enjoined from interfering with said land or with Price's right to the oil and gas and other minerals therein, and an accounting ordered. Both the Magnolia Company and the state have appealed from said judgment.

It being conceded, or at least it being true, that under the law the Commissioners of the Land Office have jurisdiction over public lands of the state with power to lease and sell such lands, the real decisive questions are, whether said commissioners have done any act which the law did not authorize them to do; or have failed to do some act which the law required them to do. The rights of all parties are to be determined by these questions, and these questions must be determined by the law relating to this subject and the terms of the lease contracts which the state has made with these parties.

The first law bearing directly upon the question herein involved was the act of Congress approved May 2, 1890, 26 Stat. L. 81, a portion of which act constitutes the Organic Act of the territory of Oklahoma, section 18 of which provides:

"That sections numbered sixteen and thirty-six in each township in said territory shall be, and the same are hereby reserved for the purpose of being applied to public schools in the state or states hereafter to be erected out of the same. In all cases where sections sixteen and thirty-six, or either of them, are occupied by actual settlers prior to survey thereof, the county commissioners of the counties in which such sections are so occupied are authorized to locate other lands, to an equal amount, in sections or fractional sections, as the case may be, within their respective counties, in lieu of the sections so occupied. * * *"

Said section further provides:

"All tracts of land in Oklahoma Territory which have been set apart for school purposes, to educational societies or missionary boards at work among the Indians, shall not be opened for settlement, but are hereby granted to the respective educational societies or missionary boards for whose use the same has been set apart. * * *"

These are all the provisions in the Organic Act which directly pertain to the subject under consideration, and it will be observed that the controlling purpose of the act was to reserve sections numbered 16 and 36 in each township for school purposes when the territory became a state. That is, said sections were reserved from homestead settlement in order that when such territory should become a state, said sections might be granted to the state for school purposes, and no other. So specific and clear is this idea carried out that it provided that in cases where said sections numbered 16 and 36, or either of them, were occupied by actual settlers prior to the survey thereof by the government, the county commissioners of the counties of the territory should have power to select other lands in lieu of the lands so occupied by actual settlers at the time of the passage of the act, in order that when the territory became a state it would have sections numbered 16 and 36 in each

township, or lands selected in lieu thereof, free and clear of all claims of actual settlers prior to the passage of the act, for common school purposes exclusively, and to reserve same from homestead settlement after the passage of the act. No provision in the entire act is clearer than that the sole purpose of Congress was to reserve said sections from homestead settlement in order that when the territory became a state it would have such lands as a permanent fund for common school purposes exclusively. No settlers' rights or preference rights of any character are recognized or contemplated except as to those actual settlers in good faith before the passage of the act, and before the survey of the lands by the government, and in such case it authorized the county commissioners to select other lands in lieu of the lands so settled. . . .

To the same effect are all subsequent acts bearing upon the subject. The act of March 3, 1893, opening the Cherokee Outlet to settlement, made the same reservation as to sections 16 and 36, and for the same specific purpose. The executive proclamation of August 19, 1893, opening the Cherokee Outlet for settlement, made the same reservation and made a reservation as to section 13 in each township for university, agricultural and normal school purposes, subject to the action of Congress; and section 33 of each township for public building purposes. By the act of March 4, 1894, Congress ratified the additional reservation made by the President and expressly reserved sections 13 and 33 in each township for the specific purposes mentioned in the President's proclamation.

The act of January 18, 1897, made similar reservations as to Greer county, and for the same purpose. Likewise the act ratifying the agreement with the Wichita Indians, and act of June 6, 1900, ratifying the agreement with the Kiowa and Comanche Indians, made the same reservations and for the same specific purpose.

This precludes the idea that Congress originally intended to give any person a preference right of any character to said lands. No provision was made in the Organic Act even for the leasing of said lands by the territory.

Let it be observed, also, that the title to these lands was not granted to the territory. They were merely reserved from homestead settlement, the title remaining in the United States until such time as such territory became a state. The lands themselves were not yet granted, but as the act

reads: "Are hereby reserved for the purpose of being applied to public schools in the state or states hereafter to be erected out of the same"—and the territory was not authorized to make any disposition of said lands by lease or otherwise until the act approved March 3, 1891, 26 Stat. L. 1026, section 18 of which provides:

"That the school lands reserved in the territory of Oklahoma by this and former acts of Congress may be leased for a period not exceeding three years for the benefit of the school fund of said territory thereof, under regulations to be prescribed by the Secretary of the Interior."

Thus it may be observed that Congress, considering that the territory had no right theretofore to lease or dispose of these lands, passed the act authorizing such lands to be leased for a period not exceeding three years for the benefit of the school fund of said territory, same to be leased by the Governor of the territory under rules and regulations of the Secretary of the Interior. And thus again it must be observed that the primary purpose of Congress was to provide for a school fund, no provision being made, nothing said about the lessee or his preference right, but it being expressly provided that the lands should be leased for a period not exceeding three years.

In the act approved May 4, 1894, 28 Stat. L. 71, Congress made the following provision:

"That the reservation for university, agricultural college, and normal school purposes, of section thirteen in each township, of the lands known as the Cherokee Outlet, the Tonkawa Indian Reservation, and the Pawnee Indian Reservation, in the territory of Oklahoma, not otherwise reserved or disposed of, and the reservation of public buildings of section thirty-three in each township of said lands, not otherwise disposed of, made by the President of the United States in his proclamation of August nineteenth, eighteen hundred and ninety-three, be, and the same are hereby ratified, and all of said lands and all of the school lands in said territory may be leased under such laws and regulations as may be hereafter prescribed by the Legislature of said territory; but until such legislative action the Governor, Secretary of the territory and Superintendent of Public Instruction shall constitute a board for the leasing of said lands under the rules and regulations heretofore prescribed by the Secretary of the Interior, for the respective purposes for which the said reservations were made, except that it shall not be necessary to submit said leases to the Secretary of the Interior for his approval; and all necessary expenses and costs incurred in the leasing, manage-

ment and protection of said lands and leases may be paid out of the proceeds derived from such leases."

The only difference in the foregoing act and section 18 of the act of March 3, 1891, is that under said section 18 the Governor was authorized to lease the reserved lands under rules prescribed by the Secretary of the Interior, while under the foregoing act of May 4, 1894, the territory was authorized to lease same under such laws and regulations as might thereafter be prescribed by the Legislature of the territory. But until the Legislature enacted laws and prescribed rules, the Governor of the territory, the Secretary of the territory, and the Superintendent of Public Instruction of the territory constituted a board for leasing said lands under the existing rules prescribed by the Secretary of the Interior "for the respective purposes for which the said reservations were made, namely, sections numbered 16 and 36 for common school funds; section numbered 13 for funds for the university and other designated educational institutions; and section numbered 33 as a fund for public buildings." Nothing yet said about the lessee or a preference right.

The next legislative act pertaining to the subject, either by Congress or by the territorial legislation, was Council Joint Resolution No. 16, S. L. 1895, 273, to wit:

"That in case the Legislative Assembly fails to enact legislation governing the leasing of lands subject to lease in this territory, the present board having control of leasing of public lands be and are hereby authorized to continue the leasing of such public lands; Provided, also, they are authorized to lease lands lying west of range fourteen (14) in such quantities as in their judgment may be most advantageous to the public interest. Approved March 8, 1895."

Nothing is said in any act so far about a preference right. However, after the passage of the act of May 3, 1891, 26 Stat. L. 1026, which authorized the leasing of such lands for a period not exceeding three years under regulations to be prescribed by the Secretary of the Interior, the Secretary of the Interior adopted a rule of which the following is a part: "In case a new lease is made at the end of the third year, the preference right shall be given the former lessee."

Without deciding the question whether the above clause in the secretary's regulations exceeded the limitations placed by section 36 of the act of May 3, 1891, such question not being material to the decision of this case, this rule of the secretary is the first expression or first attempt to ex-

tend a preference right to the lessee, and whether it exceeded the limitations placed by said act by granting a preference right to re-lease when the act says it shall be leased for a period not exceeding three years, is immaterial to decide, and, without deciding this question, we do decide that said rule does not grant to the lessee a perpetual preference right to lease any of said lands, nor did it impose upon the territory the obligation to perpetuate the lease granted in the event it appeared to the territory that it was to its better interest not to re-lease such lands. The rule merely provides in case a new lease is made, without imposing any compulsory obligation to make such lease, but in case a new lease is made at the end of the third year, "the preference right should be given the former lessee."

The next legislation materially bearing upon the question of "preference right" is contained in the Enabling Act and the Constitution of the state. These two acts constitute a contract and compact between the government and the state of Oklahoma. On the part of the government they constitute a grant with certain conditions. On the part of the state they constitute an acceptance of a grant and an acquiescence in the conditions. Previous to this time the title to the land was in the government. After the adoption of the Constitution this completed contract superseded all previous agreements, reservations, rules, and regulations with reference to the land and completed its conveyance to the state. Hence, it is immaterial what the various legislative acts had been prior to this time, and immaterial as to what regulations may have been promulgated prior to this time.

We have referred to previous acts of Congress and legislative acts of the territory and the rules and regulations pertaining to this land for two purposes: First, to answer the contentions of defendant in error Price that Congress gave to the lessee the absolute right to use and occupy the land indefinitely and in perpetuity by reason of the preference right to re-lease under the secretary's rules; and, second, to show that the primary purpose of Congress, throughout all the acts pertaining to these lands, was to provide for a school fund and other designated funds for the state and to enforce subservience to the best interest of such funds.

Sections 7, 8, 9, and 10 of the Enabling Act, or so much thereof as pertain to the subject involved, are as follows:

Section 7. "That upon the admission of the state into the Union sections numbered sixteen and thirty-six in every township in Oklahoma Territory and all indemnity lands

heretofore selected in lieu thereof, are hereby granted to the state for the use and benefit of the common schools. * * * There is hereby appropriated, out of any money in the treasury not otherwise appropriated, the sum of five million dollars for the use and benefit of the common schools of said state in lieu of sections sixteen and thirty-six. * * *"

Section 8. "That section thirteen in the Cherokee Outlet, the Tonkawa Indian Reservation and the Pawnee Indian Reservation, reserved by the President of the United States by proclamation issued August 19, 1893, opening to settlement the said lands, and by any act or acts of Congress since said date and section thirteen in all other lands which have been or may be opened to settlement in the territory of Oklahoma, and all lands heretofore selected in lieu thereof, is hereby reserved and granted to said state for the use and benefit of the University of Oklahoma and the University Preparatory School, one-third; of the normal schools now established or hereafter to be established, one-third; and of the Agricultural and Mechanical College and the Colored Agricultural Normal University, one-third: The said lands or the proceeds thereof as above apportioned shall be divided between the institutions as the Legislature of said state may prescribe: Provided, That the said lands so reserved or the proceeds of the sale thereof shall be safely kept or invested and held by the said state and the income thereof, interest, rentals or otherwise, only shall be used exclusively for the benefit of said educational institutions. Such educational institutions shall remain under the exclusive control of said state and no part of the proceeds arising from the sale or disposal of any lands herein granted for educational purposes, or the income or rentals thereof, shall be used for the support of any religious or sectarian school, college or university.

"That section thirty-three, and all lands heretofore selected in lieu thereof, heretofore reserved under said proclamation, and acts for charitable and penal institutions and public buildings shall be apportioned and disposed of as the Legislature of said state may prescribe.

"Where any part of the lands granted by this act to the state of Oklahoma are valuable for minerals, gas and oil, such lands shall not be sold by the said state prior to January first, 1915; but the same may be leased for periods not exceeding five years by the state officers duly authorized for that purpose, such leasing to be made by public competition after not less than thirty days' advertisement in the manner to be prescribed by law, and all such leasing shall be done under sealed bids and awarded to the highest responsible bidder. The leasing shall require and the advertisement shall specify in each case a fixed royalty to be paid by the successful bidder, in addition to any bonus offered for the lease, and all proceeds from

leases shall be covered into the fund to which they shall properly belong, and no transfer or assignment of any lease shall be valid or confer any right in the assignee without the consent of the proper state authorities in writing; Provided, however, That agricultural lessees in possession of such lands shall be reimbursed by the mining leases for all damage done to said agricultural lessees' interest therein by reason of such mining operations. The Legislature of the state may prescribe additional legislation governing such leases not in conflict herewith. (34 Stat. L. 273.)"

Section 9. "That said sections sixteen and thirty-six, and lands taken in lieu thereof, herein granted for the support of common schools, if sold, may be appraised and sold at public sale in one hundred and sixty acre tracts or less, under such rules and regulations as the Legislature of the said state may prescribe, preference right to purchase at the highest bid being given to the lessee at the time of such sale, the proceeds to constitute a permanent school fund the interest of which only shall be expended in the support of such schools. But said lands may, under such regulations as the Legislature may prescribe, be leased for periods not to exceed ten years; and such lands shall not be subject to homestead entry or any other entry under the land laws of the United States, whether surveyed or unsurveyed, but shall be reserved for school purposes only. (34 Stat. L. 274)."

Section 10, "That said sections thirteen and thirty-three aforesaid, if sold, may be appraised and sold at public sale, in one hundred and sixty acre tracts or less, under such rules and regulations as the Legislature of said state may prescribe, preference right to purchase at the highest bid being given to the lessee at the time of such sale, but such lands may be leased for periods of not more than five years, under such rules and regulations as the Legislature shall prescribe and until such time as the Legislature shall prescribe such rules these and all other lands granted to the state shall be leased under existing rules and regulations, and shall not be subject to homestead entry or any other entry under the law of the United States, whether surveyed or unsurveyed, but shall be reserved for designated purposes only, and until such time as the Legislature shall prescribe as aforesaid such lands shall be leased under existing rules: Provided, That before any of said land shall be sold, as provided in sections nine and ten of this act, the said lands and improvements thereon shall be appraised by three disinterested appraisers, who shall be nonresidents of the county wherein the land is situated, to be designated as the Legislature of said state shall prescribe, and the said appraisers shall make a true appraisement of said lands at the actual cash value thereof, exclusive of improvements, and shall separately appraise all permanent improvements thereon at their fair and reasonable

value, and in case the leaseholder does not become the purchaser, the purchaser at said sale shall, under such rules and regulations as the Legislature may prescribe, pay to or for the leaseholder the appraised value of said improvements and to the state the amount bid for the said lands, exclusive of the appraised value of improvements; and at said sale no bid for any tract at less than the appraisement thereof shall be accepted. (34 Stat. L. 274)."

The foregoing provisions of the Enabling Act constitute the grant of the lands in question and all the conditions pertaining thereto.

The provision quoted above from section 7 shows the purpose of Congress and the conditions imposed as to sections 16 and 36, to wit: "For the use and benefit of the common schools"; and the latter quotation from section 7, supra, shows the purpose and conditions imposed by the gift of five million dollars in money, to wit: "For the use and benefit of the common schools" of the Indian Territory, there being no reservations of land on the Indian Territory portion of the new state.

Section No. 8 constitutes the grant, the purpose of the grant, and the conditions pertaining to section 13, to wit: "For the use and benefit of the University of Oklahoma and other schools."

Section 8 further provides:

"That section 33 and all lands heretofore selected in lien thereof, heretofore reserved under said proclamation and acts for charitable and penal institutions and public buildings, shall be apportioned and disposed of as the Legislature of the state may prescribe."

Section 8 provides also that none of the lands granted by the act, if valuable for minerals, oil or gas, shall be sold prior to January 1, 1915, but may be leased for the periods and in the manner prescribed in the latter part of section 8, supra.

Section 9 provides that sections 16 and 36, "if sold," may be sold in the manner prescribed by section 9.

Section 10 of the act provides that said sections 13 and 33, "if sold," may be sold in the manner prescribed in section 10.

These sections constitute all the conditions imposed upon the state, and here is no hint in any of said sections, nor in all of them construed together, that the state, unless it elected to do so, was compelled to sell any of said lands. They simply provide that, "if sold," they must be sold in the manner prescribed. And as to said lands,

the state was not required to sell at all. It could have retained all of said lands and never sold a foot of same, had it so chosen, and yet not violated any of the conditions of the grant. But said grant provided that such lands, "if sold," should extend a preference right to the lessee in possession "at the time of the sale", to purchase at the highest bid. This is the only obligation imposed on the state as to the sale, except that under the provision in section 10, if such lands should be sold at all, then the lands and improvements should be appraised in a certain manner; and the very fact that said section provides that in case the lessee does not become the purchaser, he shall be paid the appraised value of his improvements, shows that Congress had no thought of granting to the lessee the absolute right to purchase, a right which he could enforce against the state whether the state chose to sell the land or not.

The state was not obligated to sell at all, but if it chose to sell, then it should appraise the land at its "actual cash value", and the improvements at their "fair and reasonable value," and in the event the leaseholder refused to pay an amount equal to the highest bid for the land at its "actual cash value" and the improvements at their "fair and reasonable value", then his rights in the premises were ended. The only right he had left in such case was the right to the appraised value of his improvements. That is, if he refused to meet the best bid, then he had no further rights than the right to recover for the appraised value of his improvements.

Under section 1, article 11, of the Constitution, these lands were accepted by the state under and with the conditions imposed by sections 7, 8, 9, and 10 of the Enabling Act. This completed the transfer of the title from the government to the state. After the adoption of the Constitution the state could dispose of said lands as it saw fit, except that it could not violate the conditions it had accepted, and no condition was contained in the Enabling Act which required the state to sell any of said lands unless it saw fit to do so.

Section 4, article 11, of the Constitution provides that all lands accepted under such grant and the conditions thereof may be sold by the state under rules and regulations prescribed by the Legislature and in conformity with the regulations of the Enabling Act.

This completes the contract between the state and the government. The grant by the government and the acceptance by the

state, which supersedes all previous agreements and reservations. The state now has complete control of such lands, to lease, or not to lease, if it so chooses; to sell, or not to sell, if it so chooses. Should it sell any of them or lease any of them, such sale or lease must not violate the conditions of the grant. Hence, the state, by section 32, article 6, of the Constitution, created the "Commissioners of the Land Office, composed of the Governor, Secretary of State, State Auditor, Superintendent of Public Instruction, and President of the Board of Agriculture, and expressly gave to such commissioners complete jurisdiction and charge of the sale, rental, disposal, and management of the lands in question, and the funds derived therefrom, under rules and regulations to be prescribed by the Legislature.

Under the Acts of 1907-8, Acts of 1909, and Acts of 1910-11, and subsequent acts (see chapter 69, Rev. Laws 1910), the Legislature provided for the sale and leasing and releasing of said lands, and prescribed the manner and method under which the Commissioners of the Land Office were to be governed.

It is our opinion, after an examination of such statutes and various acts, that none of them violate any of the conditions imposed by the grant aforesaid, nor do they violate the provisions of the state Constitution. If the statutes do not violate the conditions of the grant nor the provisions of the Constitution, the next question is whether the Commissioners of the Land Office have violated any statutes under the powers given them by the Constitution.

This question must be determined by the statutes, the Constitution, and the terms of the respective leases held by the Magnolia Company and by the defendant in error, W. T. Price. Neither the Magnolia Company nor Price can claim anything beyond the provisions of the law and the terms and conditions of their respective lease contracts.

Article 3, chapter 69, Rev. Laws 1910, authorizes the Commissioners of the Land Office to segregate oil, gas, and other mineral lands and to reserve the rights for the state to all oil, gas, and other mineral lands from the surface lessees, and authorizes said commissioners to lease said lands for oil and gas and other mineral purposes, and prescribes the conditions and regulations under which the same may be done. As appears from the record herein, the commissioners duly segregated the lands in question from sale because of the oil and gas supposed to exist therein, and the

enormous product of oil and gas that has been taken from the tract in question conclusively warrants the commissioners in so segregating said tract from sale. The land, at the time of the trial of this cause in the court below, as appears from the record, had five or six producing wells, each producing great quantities of oil, the royalties from which amount to a hundredfold more to the state than the sale of such land for agricultural purposes would have amounted to. Under the lease through which Price held possession, by the terms of which he is bound and beyond which he can claim no rights, no mention is made of his right to the oil and gas or other minerals. The only rights he had were those defined by his lease contract with the state and those defined by the laws of the state, which rights, as denied both by the laws and by his lease contract, are no more than the preference right to release such land for agricultural purposes at the expiration of his lease, if the state elects to re-lease it, and the right to purchase same when sold by the state, if the state should sell it. He has no right, under the law or under his lease contract. to force the state to sell such lands until the state elects so to do. Neither under the terms of his lease nor under the law could he force the state to re-lease such lands to him at the expiration of his present lease, if the state elected no longer to lease same for agricultural purposes, nor could he force the state to sell until the better interest of this particular state fund would be better served by a sale.

The state is bound by the terms of the Constitution and by the terms of the grant to protect him in his preference right to release if the land is re-leased, and the preference right to purchase, at the time of sale, if the land is sold. This is as far as the state is obligated to the lessee without violating the conditions of the grant itself, the uppermost purpose in the grant being to protect the school, educational, and public building funds, for which purposes the land was granted to and accepted by the state.

The Commissioners of the Land Office could not have acted in good faith to the trust imposed in them by the Constitution and by the statute if they had advertised this land, believing that it contained oil and gas products which would pay a hundredfold more to the state than the sale of the land would pay, but, as a matter of course, and as a matter of law, had the state sold and conveyed such land to the lessee, then the lessee would have had the right to the oil and gas therein, but the state has not sold it, and the lessee has not

purchased it. and until the land is sold and purchased by the lessee and fee simple title conveyed to the lessee, such lessee has no right to the oil and gas or other minerals therein.

It appears from the record and is suggested in the briefs that at one time this land had been appraised and advertised for sale as prescribed by law, but withdrawn from the market before the sale was made. and that if Price had any right to enforce a sale he should have procured such right through a proceeding in mandamus for the enforcement of the sale. Whether this proposition be true or not we deem immaterial. The fact is that he did not; therefore it is unnecessary to decide whether, under the terms of his lease and the provisions of law, he could have enforced the sale of such lands until the state elected to sell same. Nor is it necessary to decide that if the lands had been sold and conveyed to Price by the Commissioners of the Land Office, knowing that it was swimming in rich pools of oil and gas, whether they could have been criminally prosecuted for making such sale, knowing such state of facts. The fact is that they were apprised of the oil values of the land, and in consonance with the trust reposed in them they acted for the better interest of the state.

We have examined the various acts of Congress and all of the acts of Congress upon this question, including the Enabling Act, and have also examined and are reasonably familiar with the provisions of our state Constitution. We have also examined the various acts of the state Legislature with reference to the sale and leasing of the public lands, and have examined the form, terms, and conditions of the lease contract under which defendant in error Price claims, and are of the opinion that neither under the terms of his lease, the provisions of the statutes. the Constitution, nor the conditions of the Enabling Act, when applied to the facts in this case. is he entitled to the oil and gas therein. nor entitled to anything with reference to the oil and gas lease in question further than that prescribed by law, to wit: Any and all damages that he may sustain to his agricultural lease by reason of the operation of said oil and gas wells. If the drilling operations upon this land and the operation of the wells thereon have damaged him to any extent in the free exercise of his agricultural lease. he is entitel to such damages as he has sustained. but he is not entitled to the oil and gas. nor the royalties from the wells. nor authorized

to unduly interfere with the operations of same.

It is, therefore, our opinion that the trial court erred in dissolving the temporary injunction granted in the first place and in rendering the judgment herein appealed from.

The judgment is therefore reversed, and the temporary injunction against defendants in error, W. T. Price and his wife, Ora Price, is hereby made perpetual, and the said defendants in error are hereby perpetually enjoined from interfering with the operations of said oil and gas lease, and the state is hereby decreed to be entitled to all royalties of oil and gas produced under said lease, and defendants in error are decreed to be entitled to such damages as they may have sustained to their agricultural lease by reason of the operation of said oil and gas lease.

All the Justices concur.