PRICE ET AL. *v.* MAGNOLIA PETROLEUM COMPANY ET AL.

ERROR TO THE SUPREME COURT OF THE STATE OF OKLAHOMA.

No. 14. Argued November 13, 14, 1923.—Decided March 2, 1925.

The Oklahoma Enabling Act provided that sections 33 of the public lands, theretofore reserved, should be apportioned and disposed of as the legislature might prescribe; that, where any of the lands granted the State were valuable for minerals, they should not be sold before January 1, 1915, but might be leased for periods not exceeding five years on royalties, providing that agricultural lessees in possession should be reimbursed by the mining lessees for damages done their interests by mining operations; that the lands "if sold" might be appraised and sold at public sale, under such regulations as the State might prescribe, the preference right to purchase at the highest bid being given the lessee "at time of such sale"—*Held*, that an agricultural lessee was not entitled under the act to compel a sale of the land covered by his lease in order that he might purchase it; and that the State was authorized, finding the tract valuable for oil and gas, to execute an oil and gas lease to other parties, subject to the surface rights of the agricultural lessee. Act of June 16, 1906, §§ 8, 10, c. 3335, 34 Stat. 267. P. 421.
86 Okla. 105, affirmed.

ERROR to a judgment of the Supreme Court of Oklahoma reversing a decree in favor of the plaintiffs in error, Price and wife, in a suit brought by the Petroleum Company to enjoin them from interfering with its operations under an oil and gas lease on land covered by a prior agricultural lease to Price. The State intervened to assert its ownership of the land and uphold the oil and gas lease.

Mr. *E. E. Blake,* with whom Messrs. *J. F. Sharp, C. B. Stuart, M. K. Cruce,* and *W. C. Stevens* were on the brief, for plaintiffs in error.

Messrs. *B. B. Blakeney, George E. Merritt* and *A. T. Boys,* for defendants in error. Messrs. *George F. Short,* Attorney General of the State of Oklahoma, *C. W. King,* Assistant Attorney General, *W. H. Francis* and *Herbert Ambrister* were also on the brief.

MR. JUSTICE SANFORD delivered the opinion of the Court.

The subject matter of this controversy is a tract of land held by the State of Oklahoma as part of its public land, on which it made two leases: the first an agricultural lease to William T. Price; the second an oil and gas lease to the Magnolia Petroleum Co. The Magnolia Company brought a suit in equity in a district court of the State to enjoin Price and wife from interfering with its operations under the oil and gas lease. They made defense, alleging that the oil and gas lease was invalid and impaired their preference right under the agricultural lease to purchase the entire tract, including the oil and gas therein. The State, as intervener, asserted its ownership of the land and the validity of the oil and gas lease. The District Court, on final hearing, entered a decree in favor of Price and wife. This was reversed by the Su-

preme Court of Oklahoma, which adjudged and decreed
that the oil and gas lease to the Magnolia Company was
valid, and that Price and wife be perpetually enjoined
from interfering with its operations.  86 Okla. 105.

The federal questions presented rest, in substance, upon
the contention that as applied in this case the Oklahoma
acts under which the gas and oil lease to the Magnolia
Company was executed, deprived Price, as the agricul-
tural lessee, of a preference right to purchase the land in
its entirety, vested in him by the Oklahoma Enabling
Act of 1906.

The tract in controversy is a quarter of a section num-
bered 33 lying within the lands formerly included in the
Territory of Oklahoma that were opened to settlement by
an Act of June 6, 1900.[1]  This Act provided that sections
13 and 33 in each township should not be subject to entry,
but should be " reserved " for " university, agricultural
colleges, normal schools and public buildings of the Ter-
ritory and future State of Oklahoma."

Prior to statehood the Territorial Leasing Board made
short term agricultural leases on these reserved lands,
with preference rights of re-leasing.[2]

The Enabling Act of June 16, 1906,[3] by § 7 and § 8,
granted to the State, upon its admission, sections 13, 16
and 36 in the several townships of the Territory of Okla-
homa, for the use and benefit of universities, colleges and
schools, as therein specified.

By § 8 it was provided that sections 33 theretofore re-
served for charitable and penal institutions and public
buildings, should " be apportioned and disposed of as the
legislatur  of said State may prescribe "; and, further,
that " Where any  .  .  .  of the lands granted by this
Act to the State  .  .  .  are valuable for minerals,"

[1] 31 Stat. 672, c 813, § 6
[2] Act of May 4, 1894, c.   28 Stat. 71.
[3] 34 Stat 267, c. 3335.

42684—25—2

including gas and oil, they should not be sold by the State before January 1, 1915, but might be leased for periods not exceeding five years, at a fixed royalty in addition to any bonus offered, ".Provided, however, That agricultural lessees in possession of such lands shall be reimbursed by the mining lessees for all damage done to said agricultural lessees' interest therein by reason of such mining operations."

By § 10 it was provided that "said sections thirteen and thirty-three, aforesaid, if sold, may be appraised and sold at public sale . . . under such rules and regulations as the legislature of said State may prescribe, preference right to purchase at the highest bid being given to the lessee at the time of such sale, but such lands, may be leased for periods of not more than five years . . . : *Provided,* That before any of the said lands shall be sold . . . the said lands and the improvements thereon shall be appraised by three disinterested appraisers . . . and in case the leaseholder does not become the purchaser, the purchaser at said sale shall . . . pay to . . . the leaseholder the appraised value of said improvements, and to the State the amount bid for the said lands, exclusive of the appraised value of improvements."

The terms and conditions of the Enabling Act were accepted by the State of Oklahoma by an "irrevocable" ordinance. *Coyle* v. *Oklahoma,* 221 U. S. 559, 564; *Sperry Oil Co.* v. *Chisholm,* 264 U. S. 488, 493. And the State by its constitution accepted all grants of land made by the United States under the Act, "for the uses and purposes and upon the conditions, and under the limitations for which the same are granted."[4]

The state constitution placed the sale and rental of the public lands in charge of Commissioners of the Land Office.[5] By subsequent acts of the legislature it was pro-

---

[4]Art. XI, § 1.          [5]Art. VI, § 32.

vided: That the Commissioners should have an appraisal made of all lands granted the State for educational and public building purposes, showing the value of the lands and of the improvements thereon, and the names of the lessees occupying them;[6] that when any tract of the public lands was known or deemed by the Commissioners to contain oil or gas or to be valuable for such purposes, they should segregate the oil and gas deposits from the surface use and interest, thereby withdrawing the land from sale until they terminated such segregation, and might separately lease the oil and gas interest therein;[7] that the Commissioners should sell certain of the public lands, including sections 33 granted to the State for charitable institutions and penal buildings, at public auction, at which any lessee holding a lease thereon should "have the preference right to purchase" at the highest bid;[8] and that the reserved lands whose proceeds were to be used for penal, charitable and public buildings, should be leased until sold as provided by law.[9]

Oklahoma was admitted as a State in November, 1907.[10] The quarter section in controversy was not known then or for many years thereafter as oil and gas land. It was then held by one Click under an agricultural lease from the Territorial Leasing Board to January 1, 1908, with "a preference right" of re-leasing. This right of re-leasing was not questioned by the State. The lease was extended for two successive years, first under a general statute,[11] and then under rules of the

---

[6] Laws, 1907-8, c. 49, art. 2, p. 484.

[7] Laws, 1907-8, c. 49, art. 4, p. 490; modified in immaterial respects, by Laws, 1917, c. 253, p. 462.

[8] Laws, 1909, c. 28, art. 2, p. 448.

[9] Laws, 1909, c. 28, art. 1, p. 440.

[10] Proclamation of the President, Nov. 16, 1907, 35 Stat. pt. 2, p. 2160.

[11] Laws, 1907-8, c. 49, art. 2, p. 484.

Commissioners. In January, 1909, the land and the improvements thereon were appraised. In October, Price purchased the interest of the lessee. After January 1, 1910, he continued to occupy the land and pay rentals thereon to the Commissioners, and was recognized by them as the lessee. In 1911, the Commissioners, after advertisement, sold at public sale the three other quarters of the same section 33, and other public lands in the vicinity. There is evidence that Price appeared at this sale and requested the officers in charge to sell his quarter section also, and that this was refused, the reason given being that it had not been advertised. There is no evidence that he thereafter requested, at any time, that a sale be made of this quarter section.

In 1913, the Commissioners leased Price this quarter section, for agricultural and grazing purposes, until December 31, 1914. The lease recited that it was subject to the right of the State to sell the land at any time and that, upon such sale, Price, as lessee of the land, should be entitled to purchase the same at the highest bid, subject to the conditions provided by law; and also provided that he should have " the preference right " to re-lease the land as provided by the laws of the State. This lease was subsequently extended for one year; and thereafter Price, without any formal extension or renewals of the lease, continued in possession of the premises and paid rentals to the Commissioners, and was in such possession, holding over as the agricultural lessee recognized by the Commissioners at the time this suit was commenced. His status as a lessee has not been questioned in any way, and the case has been tried by all parties on the theory that he has the full rights of an agricultural lessee of the land.

In 1915, the Commissioners declared this quarter section valuable for mineral purposes, and adopted a motion segregating the same, and withholding it from sale. And

in 1919 they executed the oil and gas lease to the Magnolia Company that is now in controversy. The lease contained a provision that the Company should be liable to the surface lessee for all damage accruing to the surface interest. This liability the Company has never disputed.

The Supreme Court of Oklahoma held, in substance, that Price had no right either under the Enabling Act or the Oklahoma statutes to require the State to sell the land at any time; and that the action of the Commissioners in withholding the land from sale, segregating the oil and gas, and leasing the same to the Magnolia Company, was in accordance with the provisions of the State statutes, and not in violation of any right vested in Price as an agricultural lessee either under those statutes or under the Enabling Act.

The underlying federal question presented is based upon the contention that under the provisions of the Enabling Act, constituting a trust upon which the public lands were granted to the State, Price, as an agricultural lessee, was vested with the preference right to purchase the land as an entirety and to require the State to sell the entire interest in the same, and that the Oklahoma statutes authorizing the segregation of the oil and gas and the execution of a separate lease thereto, as applied in this case, impaired the value of the fee in the land and deprived Price of his preference right to purchase the land as an entirety, in violation of the due process clause of the Fourteenth Amendment.

We cannot sustain this contention. By § 8 of the Enabling Act it was provided that sections 33 should be apportioned and disposed of "as the legislature . . . may prescribe"; and, further, that where any of the lands granted to the State "are valuable for minerals" they should not be sold before January 1, 1915, but might be leased upon royalty, provided that the mining lessee

should reimburse the agricultural lessee for damage done
by the mining operation. This authority to make mining
leases clearly applied not merely .to the land then known
to be valuable for minerals but to such as' might there-
after be found to be valuable for such 'purposes; and it
did not require the State to sell such lands at any time,
but merely. prohibited their sale before the date specified.
It impliedly authorized the making of mining and agricul-
tural leases upon the same land. Furthermore § 10, by
its 'specific terms, did not require the State to sell sections
33 at any time, but merely provided that " if sold " they
might be appraised and sold at public sale, under such
rules and regulations as the State might prescribe, the
preference right to purchase at the highest bid being
given to the lessee " at the time of such sale."

We think it clear that these provisions of the Enabling
Act, read together, gave the State entire discretion as to,
the time of selling these lands and the extent to which
they should be sold. They did not require that all or any
part of them should be sold, but merely provided that
" if " the State sold them they must be sold in the man-
ner prescribed, and the preference right of purchase be'
given the lessee in possession at the time of sale. The.
State was not bound to sell them at any time; or at all,
but might retain them as long as it deemed proper, and
make meanwhile such leases as it desired not in conflict
with the provisions of the Act. There was no provision
in the Act, and none is implied, that the agricultural lessee
might require the State to sell the land in its entirety
whenever he desired to purchase the same; and nothing
that gave him any right to purchase the land in its en-
tirety or that prevented the State from executing oil and
gas leases, as well as agricultural leases, whenever it
deemed this the most advantageous method of realizing
the full value of the lands for the public purposes for
which they were granted to it. Plainly it was not in-

tended that the mere making of an agricultural lease should put the State at the mercy of the lessee, and require a sale of the land before its value had been ascertained or the available revenue derived from it. · In short, the preference right of purchase given the lessee by the Act was merely the preference right of purchasing the land in the condition in which it might be when and if the State chose to sell it; and not a right to compel the State to sell it, either in its entirety or otherwise, whenever he wished to buy.

It results that the Oklahoma statutes under which, as held by the Supreme Court of the State, the Commissioners were authorized to withhold this quarter section from sale and to execute the oil and gas lease to the Magnolia Company, did not impair any right vested in Price as an agricultural lessee by the provisions of the Enabling Act, or deprive him of any right as such lessee in violation of the Fourteenth Amendment.

In so far as the other federal questions presented were in issue under the pleadings or raised in the court below, they are necessarily answered by what we have already said, and need not be considered in detail. They show no error in respect to any federal question. And the judgment is

*Affirmed.*