HIGHER EDUCATION — FACULTY MEMBER — SALARY INCREASE — FAILURE TO MAKE DONATION The governing board of regents of a member institution of the Oklahoma State System of Higher Education, in exercising its discretion to grant or deny a salary increase to a faculty member, cannot exercise such discretion in an arbitrary manner by denying such salary increase for the reason that the faculty member did not donate money to a particular fund at the institution. Rather, a decision on such increase must be related to job performance, qualifications, skills, or educational achievements of the faculty member. The Attorney General has considered your request for an opinion wherein you ask, in effect, the following question: Can a faculty member at an institution of higher education be denied a salary increase for the reason that such faculty member does not donate money to the institution employing such faculty member? The governing boards of regents of the various member institutions of the State System of Higher Education are empowered to employ and fix the compensation and duties of personnel at the respective institutions. For example, this authority is specifically set forth for the Board of Regents of the University of Oklahoma at 70 O.S. 3305 [70-3305](b) (1971), the Board of Regents for Oklahoma State University and the Agricultural and Mechanical Colleges at 70 O.S. 3412 [70-3412](b) (1971), and the Board of Regents of Oklahoma Colleges at 70 O.S. 3510 [70-3510](b) (1971). The other governing boards of member institutions of the State System are granted by statute the same powers and duties relating to employing and fixing the compensation and duties of personnel at their respective institutions. The exercise of this authority to employ and fix compensation of personnel naturally involves administrative discretion which encompasses consideration of employees from time to time for salary increases. The exercise of administrative discretion by an agency of the State is subject to the test of reasonableness, that is, it must be exercised in a reasonable or rational manner and not be arbitrary. Hennessey v. Independent School District No. 4, Lincoln County, 552 P.2d 1141 (1976); Associated Industries of Oklahoma v. Industrial Welfare Commission, 185 Okl. 177,90 P.2d 899 (1939), and Glass v. United States, 506 F.2d 379
(10th Cir. 1974). The exercise of administrative discretion in considering faculty members for salary increases would be presumed to be reasonable or rational and not arbitrary where such consideration is based upon job performance, qualifications, skills, or educational achievements of the faculty member, or other like considerations bearing a reasonable or rational relationship to the position held by the faculty member. Conversely, where a faculty member is denied a salary increase by the governing board of regents of a member institution of the State System for the reason that such faculty member did not contribute money to a particular fund at that institution, such denial based upon this ground would not appear to be reasonable or rational, but would be an arbitrary exercise of administrative discretion by the governing board. It is, therefore, the opinion of the Attorney General that the governing board of regents of a member institution of the Oklahoma State System of Higher Education, in exercising its discretion to grant or deny a salary increase to a faculty member, cannot exercise such discretion in an arbitrary manner by denying such salary increase for the reason that the faculty member did not donate money to a particular fund at the institution. Rather, a decision on such increase must be related to job performance, qualifications, skills, or educational achievements of the faculty member. (GERALD E. WEIS) (ksg) ** SEE: OPINION NO. 87-109 (1987) **
NOTE*** In error, this opinion (76-311) was published with the first few pages missing. . . . . It starts in the book as follows:
ATTORNEY GENERAL OF OKLAHOMA — OPINION
as the Legislature shall prescribe as aforesaid such lands shall be leased under existing rule :" (Emphasis added) The grant of these lands to the State of Oklahoma was accepted by the State by the adoption of its Constitution, the pertinent portion of which is set forth below: Article XI, Section 1 states: "The State hereby accepts all grants of land and donations of money made by the United States under the provisions of the Enabling Act, and any other Acts of Congress, for the uses and purposes and upon the conditions, and under the limitations for which the same are granted or donated; and the faith of the State is hereby pledged to preserve such lands and moneys and all moneys derived from the sale of any of said lands as a sacred trust, and to keep the same for the uses and purposes for which they were granted or donated." The binding effect of the grant of the Enabling Act and the acceptance by the Oklahoma Constitution was set forth in the early case of Magnolia Petroleum Company v. Price,86 Okl. 105, 206 P. 1033 (1922): ". . . These two Acts constitute a contract and compact between the government and the State of Oklahoma. On the part of the government, they constitute a grant with certain conditions. On the part of the state they constitute an acceptance of a grant and an acquiescence to the conditions . . . ". . . After the adoption of the Constitution, this completed contract superseded all previous agreements, reservations, rules and regulations with reference to the land . . ." The Constitution also created a board to manage the lands granted by the previous enactments, thus, Article VI, Section 32, provides as follows: "The Governor, Secretary of State, State Auditor, Superintendent of Public Instruction, and the President of the Board of Agriculture, shall constitute the Commissioners of the Land Office, who shall have charge of the sale, rental, disposal, and managing of the school lands and other public lands of the State, and of the funds and proceeds derived therefrom under rules and regulations prescribed by the Legislature." (Emphasis added) This identical language was re-adopted by the Legislature in 64 O.S. 1 [64-1] (1971). A close examination of all the previous enactments indicates that no specific right to release any lands is contained therein. It must therefore be determined whether the creation of such a right by House Bill 1163 violates the regulatory authority of the Legislature. The Legislature is bound by the terms of the Enabling Act and the Constitution and must not violate its provisions in regulating such lands. Thus, in the Magnolia case, supra, the Court stated at page 1038 as follows: "After the adoption of the Constitution, the state could dispose of said lands as it saw fit, except that it could not violate the conditions it had accepted, * * *" The regulatory authority of the Legislature was discussed at some length in the case of Betts v. Commissioners of the Land Office, 110 P. 766 (1910): "The word 'regulation' as used in the Constitution, has a well defined meaning. As given by Webster it is 'a rule or order prescribed for management or government; prescription; a regulating principle; a governing direction; precept; law; as the regulations of a society.' "So we think the provision, 'under such regulations as may be prescribed by law', means such reasonable rules as may be prescribed from time to time by the legislative department of the government. Therefore, in leasing state lands, the board must first look to the statutes to ascertain the regulations therein prescribed, and then, in exercising their constitutional powers, they must so act as in the judgment of the board will secure the maximum amount under the prescribed regulations, the power to regulate being expressly reserved to the Legislature. It would appear that the creation of a right to release is well within the meaning and intent of regulating by the Legislature unless it is otherwise prohibited by the Enabling Act or the Constitution of the State of Oklahoma. As noted previously, while no specific right to release is contained in these documents, no specific prohibition is contained therein. It should be noted that the Magnolia case, supra, questioned the authority of the Secretary of Interior to create a releasing right prior to statehood. Neither that decision nor any subsequent decision from the Oklahoma courts has definitively ruled that it would be prohibited. You suggest in your opinion request letter that a preference right to renew would violate the Enabling Act provisions which limit the number of years which the land may be leased. Certain authorities from other jurisdictions are cited in support thereof, but it would appear that these authorities are dealing with an attempt to grant an absolute right to renew whereas Section 3 of House Bill 1163 does not grant an absolute right to renew, but said right is conditioned upon making proper application on or before October 1, next preceding the expiration of the term of the lease and having in good faith complied with the requirements of the existing lease to the satisfaction of the Commissioners of the Land Office. And subject further to a determination by the Commissioners of the Land Office that the land shall be leased. Thus, the lessee must show satisfactory compliance with the existing terms of his lease which if not satisfactory to the Commissioners, a renewal lease may be denied. Also, if the current lessee does not make proper application on or before October 1, as provided in the Act, next preceding the expiration of his existing lease, all others who have filed an application on or before November 1, would have an equal right to obtain the lease of those premises. As mentioned above, you refer to several authorities from other states in your opinion request letter. Of those authorities, we feel that a case cited from the Supreme Court of New Mexico to be very pertinent considering the legislation enacted by the State of Oklahoma. Reference is made to State, ex rel., McElroy v. Vesely, 52 P.2d 1090. The New Mexico Supreme Court was ruling upon New Mexico legislation which provided in part as follows: "Any lessee of state lands desiring to renew his lease shall make application in writing to the commissioner on or before the first day of August preceding the expiration of his lease; and any such lessee who has in good faith complied with all the requirements of his lease shall have a preference right to release for another term of years in accordance with the laws in force at the time of the expiration of his lease." The court in considering whether said statute violated the New Mexico Enabling Act or Constitution, relied in part on an Arizona Supreme Court decision and stated as follows: "7 The Supreme Court of Arizona in the Campbell Case, supra, construing section 37 of Arizona Land Code (Laws 2d Sp.Sess. 1915, c. 5, 37, as amended by Laws 1921, c. 79), which is as follows: 'Upon application made to the commissioner, not less than thirty (30) nor more than sixty (60) days prior to the expiration of the lease, the lessee shall have a preferred right to renewal, bearing even date with the expiration of the old lease, for such term not longer than five (5) years, as the commissioner may deem proper, at a re-appraised rental,' said: 'We think that the preferred right of renewal given to the lessee is not an exclusive or absolute right, but is used in the relative sense of "better" or "superior" right, and implies a hearing or investigation to determine the quality of such right.' The Arizona Supreme Court, it is true, construed section 37 in connection with another section of that Code providing generally for leasing land in cases where there were two or more applicants; but this was done to arrive at the meaning of the words 'preferred right of renewal' in the statute construed. In view of the Enabling Act and section 132-114, Comp.St.Ann. 1929, quoted, we hold that the Legislature did not intend such right of renewal to be absolute, but as the Supreme Court of Arizona held so we hold; that it is used in the sense of a better or superior right — a question for investigation and the exercise of judgment and discretion by the Commissioner of Public Lands. "In case of conflicting applications the Commissioner of Public Lands should investigate all applications, using discretion and judgment, and award the lease, should there be contests or more than one application therefor, to the one who has the better right under the facts of the case. In this sense the act does not violate the Enabling Act." (Emphasis added) Thus it would appear that House Bill 1163 creates a superior right subject to the discretion of the Commissioners of the Land Office under the guidelines of our particular legislation being those matters mentioned in the previous paragraph. Therefore, the creation of a conditional right to release is not violative of the Enabling Act or the Constitution of the State of Oklahoma. Your second question asks, in essence, whether such a renewal right can be granted without either bidding for the lease, giving the current holder the right to meet the high bid, or if bidding is not required a negotiated premium be required. Your opinion request letter suggests that a creation of a valuable right such as a right to renew, creates an obligation for the Commissioners of the Land Office to be paid a consideration for such a right and thus raise the revenue for the purposes of the trust property. Examination of House Bill 1163 and other existing statutes contained in Title 64 fails to reveal any legislative requirement for leased property to be bid at the expiration of existing leases or for premiums to be required for a renewal lease. Therefore, no legislative authority exists for such a procedure. The Supreme Court of Oklahoma in the Betts case, supra, stated in part as follows: "This board The Commissioners of the Land Office has no inherent power to act other than under rules and regulations existing under the territory of Oklahoma continued in force by virtue of section 10 of the enabling act, or by rules and regulations as prescribed by the Legislature of the state. "It would be useless to prescribe regulations, if such regulations might be ignored whenever, in the judgment of the board, a greater revenue might be secured to the state by adopting a course in conflict with the statute." By reason of the preceding authority, the Commissioners of the Land Office are not required to seek bids or premiums for renewal of a preference right lease. As to your third question, all the provisions of House Bill No. 1163 extend certain benefits to a preference right lessee. However, Section 1 of the Bill amended 64 O.S. 253 [64-253](A) (1971) and begins with the language "Any lessee of land under the management and control of the Commissioners of the Land Office . . ." (Emphasis added) By the use of the words "Any lessee" the benefits of Section 253 A extend to both preference and non-preference right lessees. Under the doctrine of Shattuck v. Grider, Okl. Cr., 493 P.2d 829 (1972), the use of the word "any" within a statute is equivalent to and has the force of "every" and "all". The remaining provisions of the Bill refer specifically to preference right leases. Under the maxim "expressio unius est exclusio alterius" these benefits do not extend to non-preference right leases. As to your fourth question, although House Bill 1163 does not define the term "preference right lease", the intent of the Legislature appears clear in referring to existing leases which have a preference right to purchase at the high bid if the land is sold. It is for these lessees that a preference right to release was created. As stated In Re Matter of Napier,532 P.2d 423 (1975), the Oklahoma Supreme Court stated: "A legislative act is presumed to be constitutional . . . and will be upheld unless it is clearly, palpably and plainly inconsistent with the Constitution. As to your fifth question, House Bill No. 1163 does not violate the rule against perpetuities as outlined in the Oklahoma Constitution, Article II, Section 32 and 60 O.S. 31 [60-31] (1971). Article II, Section 32 states that: "Perpetuities and monopolies are contrary to the genius of a free government, and shall never be allowed, nor shall the law of primogeniture or entailments ever be in force in this State." Title 60 O.S. 31 [60-31] (1971) states that: "The absolute power of alienation cannot be suspended, by any limitation or condition whatever, for a longer period than during the continuance of the lives of persons in being at the creation of the limitation or condition, except as provided in Section 6608." As to leases in general, Wallace v. Williams, Okl., 313 P.2d 784 (1957) held that a lease agreement containing covenants for continued renewals at the tenant's option was not void for constituting a perpetuity. Furthermore, Tipton v. North,185 Okl. 365, 92 P.2d 364 (1939) held that a lease containing a covenant for perpetual renewal does not contravene the "rule against perpetuities", since the covenant to renew constitutes a part of the lessee's interest. In addition to these authorities the absence of an absolute right to a renewal lease or an absolute right to purchase otherwise avoids a perpetuities problem. Therefore, the provisions of House Bill 1163 do not violate the rule against perpetuities, even assuming that such a rule would apply against the sovereign itself. Your sixth question asks whether or not a lack of a severability clause would render the entire act void if any part of it were held unconstitutional. A severability clause is not an absolute requirement to save an act from being stricken in its entirety because of an unconstitutional portion thereof. See Battles v. State, ex rel., Oklahoma Crippled Children, 244 P.2d 320,206 Okl. 444. Your question however, need not be answered insofar as we have not found any part of House Bill 1163 to be unconstitutional and therefore the test required in the Battles case, supra, need not be examined. It is, therefore, the opinion of the Attorney General that your first question be answered in the negative in that the creation of a preference right to renew a lease is not violative of the Enabling Act or the Constitution of the State of Oklahoma. It is further the opinion of the Attorney General that your second question be answered in the affirmative in that no bidding procedure or premium for renewal procedure is required by House Bill 1163 or other provisions of law. It is further the opinion of the Attorney General that your question number three be answered as follows: Section 1 of House Bill 1163 is applicable to preference and non-preference lessees while the provisions of the remainder of House Bill 1163 are not applicable to non-preference right lessees. It is further the opinion of the Attorney General that your fourth question be answered as follows, the Legislative intent in referring to preference right leases was to indicate that on those lands now leased which by reason of the Enabling Act grant to the lessee a preference right to purchase if the land is sold, an additional right to release was being created and therefore Section 1, D of House Bill 1163 is not unconstitutional for vagueness. It is further the opinion of the Attorney General that your question number five be answered in the negative in that the provisions of House Bill 1163 do not violate the rule against perpetuities. The answer to your question number six is not required in that no provision of House Bill 1163 is found to be unconstitutional. (JAMES H. GRAY) (ksg) ** SEE: OPINION NO. 81-112 (1981) **