**ASSOCIATED INDUSTRIES OF OKLAHOMA et al. v. INDUSTRIAL WELFARE COMMISSION et al.**

No. 28705.   March 21, 1939.

Rehearing Denied April 11, 1939.

Further Rehearing Denied May 31, 1939.

Keaton, Wells & Johnston, Ames, Cochran, Monnet, Hayes & Ames, Garrett, Goodson & Rigsby. and Kleinschmidt & Johnson, for plaintiffs in error.

Mac Q. Williamson, Atty. Gen., and Fred Hansen and F. M. Dudley, Assts. Atty. Gen., for defendants in error.

DAVISON, J. This cause is presented to us on appeal from the district court of Oklahoma county. The questions involved relate to the constitutionality of chapter 52, Session Laws 1936-37, known as the "Minimum Wage Law," and the validity of orders issued under the asserted authority thereof.

The Industrial Welfare Commission of Oklahoma, organized under the provisions of said act, promulgated nine obligatory orders relating principally to wages and hours of labor in certain designated industries.

After the promulgation of the orders, and on the 16th day of April, 1938, the plaintiffs in error, Associated Industries of Oklahoma and others, as plaintiffs, commenced this action in the trial court seeking to enjoin the enforcement of the orders and the provisions of the Minimum Wage Law on the theory that the law is unconstitutional and the orders void. Plaintiffs also sought a judicial review of the orders and of the proceedings in connection therewith.

Upon trial of the case the court below upheld the act in general, but declared the portion thereof invalid which purports to authorize the establishment of minimum wages for men and minors, and likewise declared those portions of the orders void which attempted to fix minimum wages for men. In addition, the provisions of the orders which purported to extend their application to territory contiguous to designated cities were declared void for uncertainty in meaning. We shall defer for the present discussion of the details of the orders.

The plaintiffs have appealed, appearing herein as plaintiffs in error, and the defendants, Industrial Welfare Commission and its members, present a cross-appeal attacking those portions of the decision adverse to them.

The plaintiffs in error urge that the act constitutes an unauthorized delegation of legislative power in violation of section 1, article 4, of the Oklahoma Constitution; that it and the orders promulgated thereunder violate the due process clause of both the Federal and State Constitutions (section 7, art. 2, Oklahoma Constitution,

and the 14th Amendment of the Federal Constitution), and that those portions of the act authorizing the establishment of a minimum wage for men and minors are invalid by reason of the insufficiency of the title to meet the requirements of section 57, art. 5, of the Oklahoma Constitution.

It may be said in the beginning that, in determining the constitutionality of the act before us, we are not concerned with any economic question. The questions of whether the law is a good law or a bad law, whether it will prove beneficial or harmful, whether it will work benefit or whether the passage of the act was for the best interests of the state at large, is beyond the province of this court to rule upon. This was a matter solely within the power, scope, and wisdom of our legislative body. The Legislature has acted, and this court must confine itself solely to the determination of the constitutionality of said legislative act.

Viewed from a judicial standpoint, we have concluded that the act, although somewhat deficient in form, can and should, when properly interpreted, be declared a valid exercise of legislative power, and that it may be upheld with the exception of those portions of the act which provide for minimum wages for men and minors which is created by the failure of the title to forecast such provisions as are required by section 57, art. 5, of the Oklahoma Constitution.

In considering the constitutionality of the act, it should be remembered that if a legislative act is susceptible of two interpretations, one of which would render the act valid, while the other would subject it to grave doubts upon constitutional grounds, that construction should be adopted which renders the act valid and frees it from doubts on constitutional considerations. Ledegar v. Bockoven, 77 Okla. 58, 185 P. 1097; Town of Haskell et al. v. Edmond, 90 Okla. 44, 215 P. 629; Union Indemnity Co. v. Saling et al., 166 Okla. 133, 26 P.2d 217; Swindall v. State Election Board, 168 Okla. 97, 32 P.2d 691. It must also be borne in mind that the legislation, if valid, is sustainable as an exercise of the police power, and that in many respects constitutional inhibitions are reviewed in a different light when considered in connection with legislation enacted under authority of that power. State ex rel. Roth, Trustee, v. Waterfield, Court Clerk, 167 Okla. 209, 29 P.2d 24, and authorities therein cited; Pacific Gas & Elec. Co. v. Police Court, 251 U. S. 22, 40 S. Ct. 79, 81, 64 L. Ed. 112; Jones v.

City of Portland, 245 U. S. 217, 38 S. Ct. 112, 62 L. Ed. 252, L. R. A. 1918C, 765; Ann. Cas. 1918E, 660.

It must also be accepted that, under the trend of modern decisions, valid wage and hour laws may be enacted and enforced by the states under authority of the police power and without offense to constitutional inhibitions, such as the "Separation Clause" (sec. 1, art. 4, Oklahoma Constitution) and the due process clauses contained in section 7, art. 2, Oklahoma Constitution, and the 14th Amendment of the Constitution of the United States, which are incorporated in most of the Constitutions of the several states. State of Arkansas v. Crowe (Ark.) 197 S. W. 4, L. R. A. 1918A, 567; Williams v. Evans, 139 Minn. 32, 165 N. W. 495, L. R. A. 1918F, 542 (sustaining minimum wage legislation in connection with women): West Coast Hotel Co. v. Parrish, 300 U. S. 379, 81 L. Ed. 703, 57 S. Ct. 578 (sustaining minimum wage law for women). The extent to which such laws may go and whether they may comprehend men employed in the field of industry as well as women and minors is a subject of dispute in this case which shall be discussed presently.

The plaintiffs assert that the act constitutes an unauthorized delegation of legislative power in contravention of section 1, of art. 4, of the Constitution of Oklahoma, because it is said to authorize the Industrial Welfare Commission to make orders that are legislative in character without prescribing definitely the conditions upon which such orders shall be promulgated, and because it clothes said commission with authority to determine the industries to which the power conferred upon it by the act shall be applied.

The extent to which the Legislature may go in delegating the power to an administrative board to make administrative orders that are legislative in character, without offending constitutional inhibitions, has been the subject of much judicial discussion and a matter of grave concern to the best legal minds of our generation. It is somewhat difficult to ascertain the precise test by which the validity of such laws is to be determined. In the various decisions general language may be found which seems to support almost any conclusion within a very wide range when applied to a concrete problem. It is generally said that the power to legislate cannot be delegated. Herrin v. Arnold, Judge, 183 Okla. 392, 82 P.2d 977. However, any order which "looks

to the future and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power," is legislative in character. Prentis v. Atlantic Coast Line Co., 211 U. S. 210, 29 S. Ct. 67, 53 L. Ed. 150. That such orders of legislative character are made by administrative boards with judicial approval and without offense to constitutional inhibitions is well recognized in this as well as other jurisdictions. In discussing this subject we said, in Sterling Refining Co. et al. v. Walker et al., 165 Okla. 45, 25 P.2d 312 (at page 52, Okla. Rep.):

"The ordinary rule, of course, is that legislative power cannot be delegated, but this is subject to the well-recognized exception that the Legislature is authorized to outline by general law the general scope and purpose of the laws and delegate to an administrative commission the power to promulgate administrative rules and regulations. These rules may be, and are in many instances, legislative in their character. The problem under consideration has on many occasions confronted the federal courts and involved a construction of the United States Constitution. The United States Supreme Court and inferior federal courts have at all times recognized that, while it is contrary to the Federal Constitution to delegate legislative powers, strictly speaking, yet when the legislative power sought to be delegated is in defined limits and for the purpose of accomplishing the proper administration of the law, the general effect of which has been stated in appropriate legislative provisions, the delegation is not contrary to the provisions of the Constitution. * * *

"Such delegated legislative power, when conferred upon an inferior board or tribunal, becomes and is a part of the administrative functions of government."

In the Sterling Case we sustained the power conferred upon the Corporation Commission by legislative enactment to promulgate rules of a legislative character in connection with the proration of oil and gas. In commenting on the practical necessity of recognizing the power to delegate (page 51 of the Sterling Case), we said:

"Complex and ever changing conditions, such as confront us in connection with the administration of an oil and gas conservation act, render impossible the practical enforcement of laws which are so rigid in their requirement that they cannot bend to meet the varying conditions which may arise. One of the most practical methods which has been devised for the accomplishment of such ends is the vesting by the Legislature, in a commission charged with the administration of the law, the power to promulgate rules and regulations."

Perhaps the nearest approach to a precise test was stated by the Ohio Court, in Cincinnati, M. & Z. R. Co. v. Clinton County Com'rs, 1 Ohio St. 77, 78, quoted in Marshal Field & Co. v. Clark, 143 U. S. 649, 36 L. Ed. 294, 12 S. Ct. 495, and again quoted by the Minnesota Court in Williams v. Evans, 139 Minn. 32, 165 N. W. 495, L. R. A. 1918F, 542, in upholding the Minimum Wage Law of that state. That statement is as follows:

"The true distinction * * * is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made."

The Minnesota case, supra, contains a comprehensive collection of illustrative cases in which a delegation of the power to make orders of a prospective and therefore legislative character have been sustained. To those cases from other states we may add Herrin v. Arnold, supra, where in approving the Barber Act this court said:

"The essential legislative function cannot be delegated, but those cases clearly hold that the legislative body may leave to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the Legislature is to apply. Where the Legislature has defined the subject, the administrative duty of finding facts and making rules accordingly may be delegated." (183 Okla. 392, 82 P.2d 983.)

From the foregoing authorities it is apparent that the power to determine the policy of the law is primarily legislative, and cannot be delegated, whereas the power to make rules of a subordinate character in order to carry out that policy and apply it to varying conditions, although partaking of a legislative character, is in its dominant aspect administrative and can be delegated. Panama Refining Co. v. Ryan, 293 U. S. 388, 79 L. Ed. 446, 55 S. Ct. 241. On this subject, see, also, Cheadle, "Delegation of Legislative Functions," vol. 4, page 250; Selected Essays on Constitutional Law, and State v. Whitman (Wis.) 220 N. W. 929.

Bearing in mind the foregoing principles by which our judgment on the point must be guided, let us direct our attention to some of the provisions of the act now before us. Epitomizing the preliminary sections of the act, we find that section 1 de-

clares that inadequate wages and unsanitary conditions of labor have a pernicious effect upon the health and morals of employees and are contrary to the welfare of the state of Oklahoma; section 2 makes the employment of labor at inadequate wages or under conditions detrimental to the health and morals of employees unlawful; section 3 provides for the Industrial Welfare Commission to establish standards of wages and conditions of labor; section 4 authorizes the selection of an Industrial Welfare Director; section 5 makes it the duty of the commission to ascertain the wages and conditions of labor; section 6 relates to records by employers; section 7 defines a minor; section 8 provides for public hearings. This brings us to sections 9, 10, and 11, which deal with the delegated authority said to be legislative, and therefore offensive to the fundamental law. Those sections read:

"Section 9. Investigations—Rules and Regulations. If, after investigation, the commission shall find that in any occupation, trade or industry, the wages paid to female employees are inadequate to supply them necessary cost of living and to maintain the workers in health, or that the conditions of labor are prejudicial to the health or morals of the workers, the commission is empowered to call a conference composed of an equal number of representatives of employers and employees in the occupation or industry in question, together with one or more disinterested persons representing the public; but the representatives of the public shall not exceed the number of representatives of either of the other parties; and a member of the commission shall be a member of such conference and chairman thereof. The commission shall make rules and regulations governing the selection of representatives and the mode of procedure of said conference, and shall exercise exclusive jurisdiction over all questions arising as to the validity of the procedure and of the recommendations of said conference. On request of the commission, it shall be the duty of the conference to recommend to the commission an estimate of the minimum wages adequate in the occupation or industry in question to supply the necessary cost of living, and maintain the workers in health, and to recommend standards of conditions of labor demanded for the health and morals of the employees. The findings and recommendations of the conference shall be made a matter of record for the use of the commission.

"Section 10. Review of Recommendations. Upon the receipt of such recommendations from a conference, the commission shall review the same and may approve any or all of such recommendations, or it may disapprove any or all of them and recommit the subject or the recommendations disapproved of, to the same or a new conference. After such approval of the recommendations of a conference the commission shall issue an obligatory order to be effective in sixty (60) days from the date of said order, or if the commission shall find that unusual conditions necessitate a longer period, then it shall fix a later date, specifying the minimum wage for women in the occupation affected, and the standard conditions of labor for said women; and after such order is effective, it shall be unlawful for any employer in said occupation to employ women over eighteen (18) years of age for less than the rate of wages, or under conditions of labor prohibited for women in the said occupation. The commission shall send by mail so far as practicable to each employer in the occupation in question a copy of the order, and each employer shall be required to post a copy of said order in each room in which women affected by the order are employed. When such commission shall specify a minimum wage hereunder, the same shall not be changed for one year from the date when such minimum wage is so fixed.

"Section 11. Orders to Apply to All Similarly Situated. Provided, that any order made by the commission shall, as far as possible, equally affect similar industries or occupations, or parts of industries or parts of occupations in competition with each other."

In connection with the foregoing sections, it should be remembered that by section 22 of the act the other provisions thereof are made applicable to men.

Through the medium of said provisions, did the Legislature sufficiently declare the policy and purpose of the law? Are the matters thereby entrusted to the administrative board matters of detail as are necessary or proper for a practical administration? In our judgment, both of these questions must be answered in the affirmative. In these characteristics the law is essentially the same as similar laws enacted by the Legislatures of our sister states and approved by their courts of last resort. Stettler v. O'Hara (Ore.) 139 P. 743; Larson v. Rice (Wash.) 171 P. 1037; Spokane Hotel Co. v. Younger et al. (Wash.) 194 P. 595; Miller Telephone Co. v. Minimum Wage Commission of Minnesota (Minn.) 177 N. W. 341; McGraw et al. v. Industrial Commission (Utah) 85 P.2d 608.

The employment of wage earners at inadequate wages or under conditions of labor detrimental to health is by the terms of the act made unlawful. The administrative

board is empowered to determine upon investigation what are adequate minimum wages and wholesome conditions of employment and to promulgate rules for the creation and maintenance of such wages and conditions. These are the essential characteristics of the Washington, Oregon, and Minnesota acts upheld in the cases cited, supra. We are impressed by the reasoning in those cases. A different conclusion could not be announced in this case except upon consideration of an unsound distinction or an unnatural interpretation of the act.

The view is advanced that the Legislature has delegated an unwarranted authority to the commission in that it has failed to designate the particular industries included in its operation and given the commission a "roving authority to select" the trades, occupations, or professions to which its power shall be applied, and in so doing to exercise its whim, if it so chose, in the selection to be made. This challenge to the validity of the act is based upon a misinterpretation of the act. It does not leave to the commission the power to determine to what industries the act shall be made applicable, but, on the contrary, by the act itself it is made applicable to and requires the maintenance of proper working conditions and adequate minimum wages in all industries except those designated as excluded.

The fact that such conditions and wages may be maintained in some industries, trades, or occupations without the application of power or the promulgation of rules for the commission does not militate against the validity of the law. The execution or administration of any law enacted by the legislative branch of our government must necessarily be intrusted to some agency or officer, which may or may not perform its duty. A sheriff may not enforce the law against murder or liquor traffic. A county clerk may refuse to keep the records of his department. But such conceivable derelictions in duty have no bearing upon the validity of the legislative acts creating said offices.

The duty to act is positive rather than discretionary and is enjoined upon the commission by section 5 of the act, which provides in part:

"It shall be the duty of the commission to ascertain the wages and conditions of labor of women and minors in the various occupations, trades and industries in which said women and minors are employed in the state of Oklahoma."

If the commission fails to perform its duty, it does not necessarily follow that the courts are impotent to afford relief. Regardless of the nature of the remedy available, or even of the existence thereof, it would be a strange and unique doctrine to declare the law invalid because of the existence of a possibility that the officers intrusted with its enforcement might not properly discharge their duties, and we are unable to uphold such a doctrine. Of course, a different question might arise if in the future the law should be actually administered with an "evil eye and an uneven hand." Yick Wo v. Hopkins, 118 U. S. 356, 6 S. Ct. 1064, 30 L. Ed. 220.

It is also urged that because of the provision therein providing for the appointment of a conference committee the act is invalid upon the theory that the conference committee is unofficial and is clothed with sufficient authority to constitute an unauthorized delegation or redelegation of power to an unofficial body or group. If it were true that the power to decide were conferred upon the conference committee, a grave question would be presented for decision. See discussion of the question under "Delegation of Governmental Powers to Private Groups," 32 Columbia Law Review 80, and Selected Essays on Constitutional Law, vol. 4, p. 536.

However, careful scrutiny of the act does not warrant the conclusion that the conference committee is clothed with objectionable power. It is, in fact, merely advisory, and the power of decision rests wholly with the Industrial Welfare Commission, who is by the act authorized to accept or reject the recommendations of the conference committee in whole or in part, and if the recommendations are unsatisfactory, said commission may create and call a new conference committee. Thus, the ultimate power of determination rests with the commission, and the reports or determination of the conference committee are merely informative. The exercise of such advisory powers does not render the act objectionable. State ex rel. Williams v. State Board of Dental Examiners (Tenn.) 27 S. W. 1019, and Bullick v. Billheimer (Ind.) 94 N. E. 763.

Upon the foregoing considerations, we are impelled to conclude that the power delegated is administrative as distinguished from purely legislative, and that the manner in which the administrative power thus

delegated is to be exercised does not contravene constitutional inhibitions.

The plaintiffs in error also urge that the act is so framed as to constitute a violation of the "due process" clause of the Federal and State Constitutions, because specific provision is not made for the presentation of a record of the evidence in connection with the proceedings and recommendations of the conference committee.

In support of this contention reliance is placed upon the decision of the Supreme Court of the United States in Southern Railway Co. v. Virginia, 290 U. S. 190, 78 L. Ed. 260, 54 S. Ct. 148.

In that case a statute of the state of Virginia was construed by the Supreme Court of that state as authorizing the Highway Commissioner, **without notice or hearing**, to command a railway company to abolish a grade crossing when in his opinion the same should be necessary for public safety and convenience. The United States Supreme Court accepted the interpretation of the highest state court and upon consideration thereof held the act in contravention of the due process clause of the Federal Constitution because of its failure to provide for such hearing. This case is asserted to be in point on the theory that a failure to provide for the preservation of a record, in effect, operates to prevent the hearing provided by the act from being effective for the protection of the rights of the parties. It should be noticed in this connection that specific provision is made for a hearing by section 8 of the act, in the following words:

"The commission shall specify times to hold public hearings, at which time employers, employees or other interested persons may appear and give testimony as to the matter under consideration. * * *"

It is apparently intended, though not expressly stated, that the power to "specify times" for public hearings includes, incidentally, the power to provide for appropriate notice to those who might desire to appear. In other words, we are dealing with an act which specifically provides for a public hearing, but it is here contended that the act is invalid upon the authority of cases dealing with acts which contained no such provision. Thus, it is asserted that the hearing is ineffective for want of a record, but our attention is not called to any authority indicating that such an incidental matter cannot be taken care of by the board under its implied and incidental powers. That some record of the

proceedings is contemplated is indicated by the fact that section 21 provides:

"The commission shall biennially make a report to the Governor and state Legislature of its investigations and proceedings."

While this section contains no express provision for a record for judicial review, it clearly indicates that the Legislature contemplated a record of the commission's proceedings in order that the required report be made. We perceive no inhibition that prevents the commission from making the report sufficiently complete in detail to serve all of the essential purpose of proceedings prior to the rendition of an administrative order of a legislative nature. If, when the question becomes essential to the determination of a case, it should be held that such a record is requisite to the valid administration of the act, we find no deficiency in the act which **prevents** such a record. We therefore cannot declare the act invalid on this theory.

The provisions of our act were taken from the Washington Act (Washington Laws, 1913, chapter 174), which was upheld by the Supreme Court of the United States as against the contention that it violated the "due process" clause of the federal Constitution. See West Coast Hotel Co. v. Parrish, 300 U. S. 379, 81 L. Ed. 703, 57 S. Ct. 578.

The plaintiffs in error seek to avoid the force of the West Coast Hotel Company decision, supra, by pointing out that the particular point under consideration was not there discussed. The fault in this distinction is that an arbitrary and unwarranted construction of the act is necessary to raise the point. When we refrain from the unnatural construction, neither the question nor the necessity for its discussion remains. Even though it should be determined that the construction urged is one of two of which the act is susceptible, it must be eliminated upon consideration of the rule that constructions or interpretations of legislative acts which render them unconstitutional or raise grave doubts as to their constitutionality should be avoided. See the cases cited, supra, as well as National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U. S. 1, 57 S. Ct. 615, 81 L. Ed. 893.

Reference is made to the fact that by the provisions of the act, the scope of judicial review on appeal is limited to questions of law. The Workmen's Compensation Act of this state contains a similar provision with reference to judicial review

by this court of the proceedings of the State Industrial Commission (sections 13360 and 13363, O. S. 1931, 85 Okla. Stat. Ann., secs. 26, 29), which body is also an administrative board. See Union Indemnity Co. v. Saling et al., 166 Okla. 133, 26 P.2d 217. When it was found that the restriction upon the scope of review was not consistent with constitutional considerations, this court encountered no difficulty in enlarging the scope of review to permit an investigation of the weight of evidence introduced before the Industrial Commission upon the jurisdictional questions of fact, without jeopardizing the entire act. McKeever Drilling Co. v. Egbert, 170 Okla. 259, 40 P.2d 32; Tulsa Rig, Reel & Mfg. Co. v. Case, 176 Okla. 262, 55 P.2d 777; Sartin v. State Industrial Commission, 183 Okla. 268, 81 P.2d 306. From these cases it is apparent that limitations provided by the Legislature upon the scope of review do not nullify the entire act even though the limitations cannot be reconciled with constitutional requirements. In such a case the limitation will be ignored upon constitutional considerations.

While the foregoing cases do not specifically recognize the legal considerations upon which the announced result was accomplished, it is apparent upon reflection that it was justified upon settled legal principles. It is a cardinal rule that "the unconstitutionality of a portion of an act of the Legislature does not defeat or affect the validity of the remaining provisions unless it is evident that the Legislature would not have enacted the valid provisions with the invalid provisions removed if, with the invalid provisions removed, the rest of the act is fully operative as a law." This rule is aided by a provision in the present act for partial invalidity thereof (section 25 of the act). Sterling Refining Co. v. Walker, supra. Similarly, the strict and literal interpretation of a statute relating to appeals from an administrative board may be disregarded when the ends of justice demand. In re Benson, 178 Okla. 299, 62 P.2d 962. The effect of our decision on this point will be concretely illustrated in our subsequent treatment of the obligatory orders.

The plaintiffs in error also challenge the sufficiency of the title to the act to justify legislation in the body thereof relative to men. It is asserted that the title of the act is in this respect insufficient to comply with the requirements of section 57, of art. 5, of the Oklahoma Constitution, which provides in part:

"Every act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title. * * *

"Provided, that if any subject be embraced in any act contrary to the provisions of this section, such act shall be void only as to so much of the law as may not be expressed in the title thereof."

The portion of the title which is said to be obnoxious to the foregoing provision of the Constitution and insufficient to forecast provisions in the body of the act relating to minimum wages for men reads:

"An Act prohibiting the employment of men, women or minors in any industry or occupation within this state under conditions of labor detrimental to their health and morals; prohibiting the employment of women workers in any industry within this state at wages which are not adequate for their maintenance. * * *"

The defendants in error take the position that the first clause above quoted is sufficiently comprehensive in its scope to forecast minimum wage legislation for men. It is asserted that such legislation is contemplated by an act "prohibiting the employment of men * * * under conditions of labor detrimental to their health and morals." It is argued that this view of the language of the title is especially appropriate because of the legislative declaration in section 1 of the act to the effect that inadequate wages are detrimental to health and morals. The theory is thus advanced that resort may be had to the body of the act for the purpose of ascertaining the meaning of language used in the title thereof. This theory is unsound. It is said in 25 R. C. L. 851:

"* * * The title must be construed with reference to the language used in it alone, and not in the light of what the body of the act contains."

The soundness of this doctrine is demonstrated upon consideration of the purpose of section 57 of article 5 of the Constitution, supra, as judicially declared by this court. In State ex rel. Attorney General v. Johnson, 90 Okla. 21, 215 P. 945, we quoted with approval the following excerpt from Cooley on Constitutional Limitations, defining the purpose of such constitutional provisions:

"The purpose of these provisions was—first, to prevent hodgepodge or log-rolling legislation; second, to prevent surprise or fraud upon the Legislature by means of provisions in bills of which the titles gave no intimation, and which might, therefore, be overlooked and carelessly and unintentionally adopted; and, third, to fairly apprise the people, through such publication

of legislative proceedings as is usually made, of the subjects of legislation that are being considered, in order that they may have opportunity of being heard thereon, by petition or otherwise, if they shall so desire."

In conjunction with the foregoing general rule applicable in practically all jurisdictions having similar constitutional provisions, we pointed out that added importance must be attached to the provision in our Constitution because of its relation to the initiative and referendum provisions, since the people themselves look to the published reports of the legislative acts—generally, the titles—to determine whether the power thus reserved in the people themselves should be exercised.

Since the body of the act is not usually published in detail, the public cannot be deemed to determine the significance of the wording of the title by reference to the body of the act. To a less definite extent the same reasoning must be applied to the legislative vote on the measure because of the manner in which legislation is enacted. Thus, the purpose of the constitutional provision respecting titles would be defeated if language used in the title could be clarified or attributed an extraordinary meaning by reference to the body of the act. Section 1 of the act must therefore be eliminated in considering the meaning of the language employed in the title.

There is considerable discussion in the briefs as to whether the language of the first clause of the title is broad enough to comprehend minimum wages for men. Under our view of the title the decision of this question is not of controlling importance. We may well assume, without deciding, that it is of sufficient breadth. But so assuming, we cannot ignore the relation of the first clause to the conjunctive provision immediately following, which specifically forecasts minimum wages, but limits the minimum wage provisions thus anticipated to women. To a person of ordinary understanding this is equivalent to saying "this legislation contains minimum wage provisions, but those provisions do not relate to men."

Our Constitution not only requires that the title of a legislative act anticipate the subject matter of the act, but it also demands that such anticipation be accomplished with clarity. On this point, see State ex rel. Attorney General v. Johnson, supra. To clearly express anything, of course, comprehends an elimination of confusion in the expression thereof.

While the rules of statutory construction, as, for instance, the maxim, expressio unius exclusio alterius (the expression of one thing is the exclusion of another), which find general application in the interpretation of statutes, do not ordinarily apply to titles of legislative acts (59 C. J. 810), and this court is not constrained to rigidly apply the constitutional provision (sec. 57, art. 5, supra) in such a manner as to unreasonably restrict or hamper legislation (Chicago, R. I. & P. R. Co. v. Excise Bd. of Stephens County, 168 Okla. 519, 34 P.2d 274; Dabney v. Hooker, 121 Okla. 193, 249 P. 381), yet neither the inapplicability of specific rules of construction nor our frequent liberal and general expressions on this point can be construed to impart sufficiency to a title so worded as to be deceptive or even confusing to the inquisitive mind of a person of average intelligence. To do so would eliminate the requirement of clarity of expression specifically contained in the Constitution. As was appropriately said in Johnson v. Grady County, 50 Okla. 188, 150 P. 497:

"Webster defines the word 'clearly' as 'in a clear manner; without obscurity, without obstruction, without entanglement or confusion, without uncertainty.' And without doubt this is what is meant by the word 'clearly' in our Constitution. Then the title must express the subject of the act 'without obscurity, without confusion and without any uncertainty.' "

Considering, then, the title as a whole and the relation of the first and second clauses thereof to each other, we are impelled to conclude that the title is so worded as to impress the reader of ordinary intelligence with the specific idea that such minimum wage provisions as might be contained in the body of the act relate only to women. Having so concluded, it necessarily follows that section 57 of art. 5 of the Oklahoma Constitution invalidates the provisions of the act in so far as minimum wage legislation for men and minors is incorporated therein. To that extent the act is unconstitutional.

It is urged that neither the title of the act nor the act itself is broad enough to comprehend the power to regulate hours of labor for men. The question is whether the term "conditions of labor," as employed in the title and used throughout the body of the act, includes this power. The closest approach to a judicial expression upon this point to which we have been referred is that of Spokane Hotel Co. v. Younger et al. (Wash.) 194 P. 595, wherein it is stated

(alluding to an identical phrase in the Washington act):

"3. Appellants argue that the commission exceeded its authority by fixing a weekly wage rate at six days. The statute at section 11 provides that the commission shall specify the minimum wage and standard conditions for labor for women. This is clearly broad enough to justify the commission in fixing six days a week as a standard condition."

The fixing of maximum hours per day is no different in principle than the determination of the maximum working days in a week. We are of the opinion, as was the Washington court, that the hours or time of work is a condition of labor, and in so far only as they are reasonably essential for the protection of the health of the workers, limitations may be placed thereon by the commission under authority of the act.

Plaintiffs in error suggest that the authority to regulate hours of labor should be no broader than the specific delegation contained in section 5 of article 23 of the Oklahoma Constitution, which reads:

"The Legislature shall pass laws to protect the health and safety of employees in factories, in mines, and on railroads."

It is sufficient answer to this assertion to observe section 36, art. 5, of the Oklahoma Constitution, which provides:

"The authority of the Legislature shall extend to all rightful subjects of legislation, and any specific grant of authority in this Constitution, upon any subject whatsoever, shall not work a restriction, limitation, or exclusion of such authority upon the same or any other subject or subjects whatsoever."

Thus the grant of power contained in section 5 of article 23 of the Oklahoma Constitution cannot be construed as a limitation or restriction upon the power of the Legislature.

It is also contended that limitations upon the hours of labor of men cannot be countenanced upon constitutional considerations. The contention is fully answered in the case of Bunting v. Oregon, 243 U. S. 436, 61 L. Ed. 830, 37 S. Ct. 435, wherein such legislation was upheld by the Supreme Court of the United States as a valid exercise of the police power in the face of objections as to its constitutionality.

There was a time in the history of our jurisprudence when hours of labor and wages were regarded as purely matters of personal concern between employer and employee. Holden v. Hardy, 169 U. S. 366, 42 L. Ed. 780, 18 S. Ct. 383; Lochner v. N. Y., 49 L. Ed. 937, 25 S. Ct. 539.

The cases alluded to were decided prior to the decision of Adkins v. Childrens Hospital, 261 U. S. 525, 67 L. Ed. 785, 43 S. Ct. 394, 24 A. L. R. 1238. The doctrine of that case was repudiated in the more recent case of West Coast Hotel Co. v. Parrish, supra. In other words, the cases relied on were decided before the United States Supreme Court had placed its stamp of approval on legislation of this precise character, and when it did so in the Parrish Case, supra, it became necessary that its prior judicial pronouncements be abandoned in part as evidenced by its abandonment of the Adkins Case, supra. In the case of West Coast Hotel Co. v. Parrish, supra, the court properly stated that it would take judicial notice of the demands for relief occasioned by economic depression.

While it is true that, in the Parrish Case, the court was not called upon to determine whether such legislation could be extended to men as well as women and minors, yet it was asked to, and did, sanction such legislation as a proper exercise of the police power. As we have previously demonstrated, the police power is comprehensive in its nature and the situations to which it may be applied may and do vary with changing conditions. If the industrial conditions under which men are called upon to make a livelihood are such as to warrant an exercise of this power, there is no sound legal reason for inhibiting legislative action designed to correct evils beyond the power of the individual wage earners to cope with.

What might have been inappropriate from a legislative standpoint 20 or even 10 years ago, may today be well within constitutional limits and even advisable. For within the police power is found that elasticity of governmental authority so essential for a self-governing people to work out its destiny in the face of changing conditions. The reasonableness of the exercise of the police power of the state must be considered in the light of current economic conditions.

Logical reasoning does not suggest that the liberties of men to manage their own affairs and contracts are any more sacred than the rights of women, nor that the general health and morals, as affected by the conditions of labor of men, are any less a proper subject for the exercise of the police

power of the state than those of women. It is just as essential for the police power of the state to protect the health and morals of adult males as of adult females.

Whether or not the police power should be exercised or applied to a given situation within the field of its operation is in the first instance one for legislative determination. Gibbons v. M., K. & T. Ry. Co., 142 Okla. 146, 285 P. 1010. The courts possess the authority to review an application of this power, and they may question the legislative judgment if it clearly appears that there has been an unwarranted application of the power beyond the requirements of the situation sought to be corrected. State ex rel. Roth v. Waterfield, supra.

In the light of present economic conditions, we are not at liberty to question the legislative judgment in declaring that the power should be applied in the matter of defining maximum hours of employment for men so long as reasonable limits determined upon consideration of the purpose of the enactment, namely, the preservation of the health of workers, are not exceeded.

We therefore conclude that the provisions of the act authorizing the promulgation of orders fixing maximum hours of employment for men are valid.

Although we have determined that the act now before us, except a portion of the title and the provisions in the body thereof relating to minimum wages for men, is sufficient to withstand the attack upon the constitutional grounds presented, it is by no means model legislation. Its practical deficiencies will no doubt occasion many complicated problems in the course of administration which could well be avoided if the act had been drafted in the light of modern judicial expression on the law relating to administrative boards and commissions. As we have mentioned, in its principal aspects the act was copied from an act of the state of Washington promulgated in 1913, at the dawn of legislation of this character and before many of the legal principles relating to administrative boards had been judicially enunciated.

The Washington act did not relate to men, and the manner in which an attempt was made to broaden the scope of the act now before us denotes legislative haste. The history of the act explains its practical shortcomings, but does not mitigate against its legality, since its meaning and purpose can be ascertained.

This brings us to a consideration of that portion of the trial court's decision relating to the nine obligatory orders promulgated under the act.

These various orders prescribed maximum hours and minimum wages for men and women to be operative within territory described in a classification incorporated in the orders. The orders related to the following industries: (1) Laundry; (2) drycleaning and dyeing; (3) retail mercantile; (4) restaurant; (5) hotels; (6) office building; (7) wholesale and distributing; (8) automotive; and (9) retail drug. In most of the industries the territory affected was classified into divisions and a different minimum wage prescribed for each class. The classification running throughout the orders is described therein as follows:

"Class A.

"Cities and towns of 40,000 or more population and contiguous territory within two (2) miles thereof, more or less, within the discretion of the commission. * * *

"Class B.

"Cities and towns of not less than 10,-000 nor more than 40,000 population and contiguous territory within one (1) mile thereof, more or less, within the discretion of the commission.

"Class C.

"Cities and towns of less than 10,000 population and all unallocated territory outside thereof, within the discretion of the commission. * * *

"Population shall be determined by the last federal decennial census."

In most of the industries a different minimum wage was prescribed for men than women, and in most instances the minimum wage prescribed differs, sometimes quite noticeably, between the different industries in the same territory.

The orders necessarily fall in so far as they purport to establish minimum wages for men because of the invalidity of that portion of the act authorizing the establishment of such wages.

The trial court declined to consider questions relating to the reasonableness of the minimum wages and maximum hours of employment established by the orders on the theory that the questions involved were questions of fact, and that by the terms of the act the decision of the commission on such questions was and is final and conclusive. In so holding the trial court erred.

It is true, as asserted by the defendants in error, that the orders, being prospective

in their operation, are legislative in character as distinguished from quasi-judicial. It is likewise true that the character of the orders is determined by the character of the hearing preceding the same. Prentiss v Atlantic Coast Line, 211 U. S. 210, 53 L. Ed. 150, 29 S. Ct. 67. As we have already seen, we need not consider in the case at bar whether a hearing preliminary to the promulgation of such order is necessary, for such hearing is contemplated by the act. Neither is it essential that we discuss whether an appeal or other method of judicial review of such proceeding or hearing is essential upon consideration of constitutional requirements, for the reason that an appeal is provided for by the act. Similarly, it is not essential that we now determine whether upon such appeal inquiry into the reasonableness or confiscatory nature of the orders upon questions of fact should be had, for this is not such an appeal and, as we have pointed out, if such inquiry be essential, it may be afforded notwithstanding the clause in the act to the contrary.

It would not be proper for us to say that the existence of such a remedy by appeal precludes inquiry into the question of the reasonableness of orders in this, a proceeding of equitable cognizance, if the plaintiff is entitled to a judicial inquiry into that question, for, to say the least, the adequacy of the remedy by appeal was, at the time this action was instituted, doubtful by reason of the limitation incorporated in the statute purporting to prohibit inquiring into questions of fact. When doubt as to the adequacy of a legal remedy may be fairly said to exist, a plaintiff is not compelled to hazard his case upon such doubtful remedy, but may resort to equity for relief. American Life Ins. Co. v. Stewart et al., 300 U. S. 203, 81 L. Ed. 605, 57 S. Ct. 377.

The remedy being appropriate, the question is whether plaintiffs are entitled to a judicial review, and determination of the reasonableness of the orders on questions of fact.

The administrative orders before us, being prospective in their nature and legislative in character, are comparable to rate orders in public utility cases, in that both are legislative in character (Prentiss v. Atlantic Coast Line, supra) and both determine and affect the substantial financial interests of persons affected thereby.

In Chicago, M. & St. P. Ry. v. State of Minnesota, 134 U. S. 418, 33 L. Ed. 970,

10 S. Ct. 462, it was held that judicial inquiry into the reasonableness of rate orders is a matter of right guaranteed by the Constitution rather than a matter of legislative grace.

It has sometimes been said the Legislature may make the findings of an administrative board conclusive. (12 Am. Jur. 329.) But this broad statement is subject to the well-established qualification that "the requirements of due process which are specially applicable to such an agency are met, as in according a fair hearing and acting upon evidence and not arbitrarily." St. Joseph Stock Yards Co. v. United States, 298 U. S. 38, 80 L. Ed. 1033, 56 S. Ct. 720.

The legislative act here concerned constitutes an exercise of the police power. In State ex rel. v. Waterfield, supra, this court pointed out that legislation enacted under authority of this power is subject to judicial scrutiny. The judicial scrutiny thus demanded upon constitutional considerations cannot be avoided through the delegation of authority to an administrative board. As was said by the Supreme Court of the United States in St. Joseph Stock Yards Co. v. United States, supra:

"The Legislature cannot preclude that scrutiny or determination by any declaration or legislative finding. Legislative declaration or finding is necessarily subject to independent judicial review upon the facts and the law by courts of competent jurisdiction to the end that the Constitution as the supreme law of the land may be maintained. Nor can the Legislature escape the constitutional limitation by authorizing its agent to make findings that the agent has kept within that limitation. Legislative agencies, with varying qualifications, work in a field peculiarly exposed to political demands. Some may be expert and impartial, others subservient. It is not difficult for them to observe the requirements of law in giving a hearing and receiving evidence. But to say that their findings of fact may be made conclusive where constitutional rights of liberty and property are involved, although the evidence clearly established that the findings are wrong and constitutional rights have been invaded, is to place those rights at the mercy of administrative officials and seriously to impair the security inherent in our judicial safeguards."

Of course, the presumption is that due process was accorded plaintiffs, and that the orders are within the limits of reasonableness and are nonconfiscatory. The burden of establishing the contrary is upon the person asserting it. See St. Joseph

Stock Yards Co. v. United States, supra, and Shields v. Utah, Idaho Central R. Co., 83 L. Ed. 170; Oklahoma Cotton Ginners Ass'n v. State, 174 Okla. 243, 51 P.2d 327. However, the plaintiffs, having demanded a judicial inquiry into the asserted transgressions of their constitutional rights, are entitled to it as a matter of right and the trial court erred in denying the request upon the theory that the decision of the commission is conclusive on questions of fact.

We shall not undertake from the evidence before us to pass upon the reasonableness of the orders and the questions of fact in connection therewith, but we merely direct a reconsideration thereof in the trial tribunal.

In determining this question, the trial court will, of course, be governed by the fact that this is minimum wage and maximum hours legislation and is sustained as such. No attempt has been made by the Legislature to authorize the establishment of a wage scale. "Minimum wage" is almost a self-explanatory term. It alludes to the least wage upon which an ordinary individual can be self-sustaining and obtain the ordinary requirements of life. The establishment of any wage by a government is necessarily an interference with the determination of such matters by contract between individuals, and the power conferred on a governmental agency cannot be extended beyond the purpose of its authorization. To illustrate, we notice in the orders now before us that several of the industries affected have an established minimum wage for female employees of $15 per week, whereas, in another industry in the same territory (Class A) the established weekly wage for female employees is $32. Without deciding what the minimum wage should be in that territory, we are inclined to suspect that the discrepancy cannot be justified and that the latter established wage is not truly a minimum wage. We do not mean to say that the minimum wage in all industries must be the same. On the contrary, differences in the cost of living created by special circumstances attributable to the requirements of the occupation or industry may authorize a variation, but the variation must be no greater than the circumstances demand.

The trial court held that the provisions of the orders relating to territory contiguous to a municipality are void for uncertainty; that by the incorporation of the indefinite term "more or less" within the provision describing classes "A" and "B," it was made impossible to determine what industries contiguous to municipalities were to be affected by the orders, and the similar uncertainty existed in connection with the language describing additional territory in "Class C." The trial court's decision upon this point was correct.

The orders, being of a legislative character, are subject in a large measure to the rules and principles by which the validity of statutes is determined. A legislative act or portion thereof which is so vague, indefinite, and uncertain that the courts are unable to determine with any degree of certainty what was intended is void. 25 R. C. L. 810, par. 62; Buckles v. State, 5 Okla. Cr. 109, 113 P. 244; Ex parte Lucas, 33 Okla. Cr. 407, 243 P. 990; School Dist. No. 33, Choctaw County, v. Trice et al., 168 Okla. 344, 32 P.2d 906.

We have discussed the controlling features of the case at bar; we deem it unnecessary to lengthen our opinion by a treatment of other incidental points mentioned in the briefs.

The decision of the trial court is modified to conform to the views herein expressed, and as so modified is affirmed, with directions to conduct such additional proceedings in accordance with this opinion as may be necessary to accord proper relief to the parties.

Modified and affirmed.

BAYLESS, C. J., and RILEY, OSBORN, CORN, HURST, and DANNER, JJ., concur. WELCH, V. C. J., and GIBSON, J., concur in part and dissent in part.

GIBSON, J. (dissenting). I concur in the majority opinion to the extent that the title to the act in question is not sufficiently broad in its language to include the legislation concerning wages for men and minors, and is therefore violative of section 57, article 5, of the State Constitution. I agree also that the obligatory orders should be stricken down, not for the reasons specifically assigned by the majority of the court, but because in my opinion the act constitutes an unauthorized delegation of legislative powers in violation of article 4 of the Constitution, and for the further reason that the act by its specific terms would deny the parties proper judicial review of the commission's actions, and therefore would work a denial of due process of law in violation of the 14th Amendment to the Federal Constitution.

The majority opinion recognizes in the

Legislature a broader constitutional authority in the matter of delegation of its own powers than I am able to acknowledge. By sections 5, 8, 9, and 10, it has attempted to confer upon the Industrial Welfare Commission the function of prescribing minimum wages and standards of employment conditions. A course of procedure is laid down for the commission's guidance in arriving at its conclusions, and by section 20 its decisions upon questions of fact are made final, with the privilege of appeal on questions of law alone.

The Legislature is prohibited from delegating any of its lawmaking powers to administrative officers, article 4, Const., but it may enact a law complete within itself, and having a general objective, and may confer upon administrative officers the power to supply details in connection with carrying the law into effect. Wilson v. Kirkpatrick, 144 Okla. 44, 289 P. 306. The lawmaking body may confer upon administrative officers the power to make regulations for administering the laws, but may not delegate to them the power to make laws for the government of their departments. The general policy sought to be inaugurated by the statute must be clearly pronounced, and the powers of regulatory administration as conferred must be appropriate to the execution of that policy, and are valid only when clearly within the scope thereof. Panama Refining Co. v. Ryan, 293 U. S. 388. 79 L. Ed. 446, 55 S. Ct. 241; Schechter Poultry Corp. v. United States, 295 U. S. 495, 79 L. Ed. 1570, 55 S. Ct. 837.

Under the Federal Constitution the legislative power is confined to the Congress. Article 1, secs. 1, 8. Those sections provide that all legislative powers granted in the Constitution shall be vested in the Congress, and Congress is empowered to make all laws which shall be necessary and proper for carrying into execution its general powers. If a distinction between the powers of Congress as there conferred and the powers of the Legislature as conferred by our Constitution and restricted by article 4 may be drawn, it appears that article 4 more definitely confines our legislative department to its own peculiar functions. The effect of the provisions, however, is approximately the same; legislative powers are not to be delegated to agents in either case.

Although the question immediately under consideration is not a federal one, the pronouncements of the United States Supreme Court thereon may well serve as a guide. In the Panama Refining Co. Case, above, commonly referred to as one of the N. R. A.

decisions, Mr. Chief Justice Hughes, in dealing with a like question, said:

"So, also, from the beginning of the government, the Congress has conferred upon executive officers the power to make regulations,—'not for the government of their departments, but for administering the laws which did govern.' United States v. Grimaud, 220 U. S. 506, 517, 55 L. Ed. 563, 567, 31 S. Ct. 480. Such regulations become, indeed, binding rules of conduct, but they are valid only as subordinate rules and when found to be within the framework of the policy which the Legislature has sufficiently defined."

That decision clearly reveals, as hereafter shown, that the statute must first declare a legislative policy with respect to the subject of legislation; that the powers conferred must be bounded within a **stated standard of action,** and that the delegate upon whom the powers are conferred must be required to make findings in any proceeding instituted or inaugurated pursuant to his authority when the exercise of that authority would ordinarily violate the due process clause of the Constitution, though intended as a valid exception thereto under the police powers. This is made clear by the language employed by the Chief Justice of the United States in said case, as follows:

"Section 9 (c) is assailed upon the ground that it is an unconstitutional delegation of legislative power. The section purports to authorize the President to pass a prohibitory law. The subject to which this authority relates is defined. It is the transportation in interstate and foreign commerce of petroleum and petroleum products which produced or withdrawn from storage in excess of the amount permitted by state authority. Assuming for the present purpose, without deciding, that the Congress has power to interdict the transportation of that excess in interstate and foreign commerce, the question whether that transportation shall be prohibited by law is obviously one of legislative policy. Accordingly, we look to the statute to see whether the Congress has declared a policy with respect to that subject: whether the Congress has set up a standard for the President's action; whether the Congress has required any finding by the President in the exercise of the authority to enact the prohibition."

The statute here under consideration relates to the subject of certain employees in occupations and industries. The policy declared is state protection of those employees against inadequate wages and unsanitary conditions of labor such as would exert a pernicious effect upon the health and morals of said employees.

Looking to the sections of the statute mentioned above, we find that the regulation of all occupations, trades, and industries, with reference to the so-called welfare of the employees engaged therein, is purportedly given over to the Industrial Welfare Commission, except, by section 23, the occupations of agriculture, horticulture, or dairy or stock raising are withheld from the commission's supervision. Though the Legislature has definitely designated the occupations to be excluded from the operation of the act, no attempt was made to name by particular designation the occupations, trades, and industries included in its operation. The names of those occupations, trades, and industries by particular classification were as well within the knowledge of the Legislature as they can ever be within the knowledge of the commission. They could have been designated in the statute. None of the words "occupation" nor "trade" nor "industry" is definitive of any particular business or calling. The commission is given a roving authority to select a trade, occupation, or profession and to make this subservient to its will, or to the will of that unidentified conference which it may call. It is left free to roam at large through the host of occupations, selecting or rejecting at random, and according to whim, if whim it would indulge, any one or more thereof over which to extend its supervisory powers, or from which it will withhold them.

None can invoke its original jurisdiction or gain its attention in the first instance to any given claim or abuse. Though we are to presume that the commission will perform its duties, no duty is placed upon it to consider at any time the wishes or initial petitions of those affected by the act. It may in any instance stand unmoved, for no right is extended to anyone to invoke its original action. Since it is not susceptible to petition, how can it be presumed that it will act at all, or, if action is taken, it will lend a hearkening ear to all alike? So, in this respect, it is set to work without yardstick, without a standard of action, to guide it.

The wage authorized by this act is the minimum wage required to support in health and morals. "The bare cost of living must be met." West Coast Hotel Co. v. Parrish (infra). The act does not contain any definite standards, limitations, or yardstick for the guidance of the administrative board in finding such cost. What elements must the board consider in fixing the wage beside the cost of food and clothing? Is a sum to provide for insurance against old age dependence to be considered? Must cosmetics and cigarettes be provided for? The questions may be ludicrous, yet they illustrate that an unguided board has the power to fix the wage through caprice rather than upon sound judgment and common sense.

The commission is permitted, not merely to find facts upon which to apply a rule, but is left to say how, and when, and in relation to whom it will act, or whether it will act at all. These are legislative powers beyond those which it may delegate. They fall within those essential legislative functions which cannot be delegated. (Herrin v. Arnold, Judge, 183 Okla. 392, 82 P.2d 977.)

There is another reason why the act should not stand as a valid and complete statute with powers merely administrative conferred. It will be noted that the commission does not actually formulate its policies and make its obligatory orders there authorized except as the automaton of an unnamed and unofficial group designated a "conference," made up of citizens to be called into action by the commission. The recommendation of this conference is, in the final analysis, controlling, and the order of the commission must reflect the desires of the conference, and is in no sense the independent judgment of the commission. We spoke of a similar situation in Herrin v. Arnold, supra. In discussing the same constitutional question with reference to the Barber Law (art. 2, ch. 24, S. L. 1937) we said:

"It must be conceded that, if the section does confer such power on an unnamed, unofficial group, it is within the inhibition of the Constitution. It is also apparent that the act would be invalid if the agreement referred to were approved without investigation, or even if the agreement were considered as the sole evidence of the facts which the board is authorized to find, since no agreements of individuals could make facts exist which do not exist, so far as others and the public are concerned."

The agreement there mentioned was that entered into by a certain per cent. of the barbers of any city as to prices to be fixed, and that committee of barbers performs a very similar function to that of the conference mentioned in the statutes here. There the barber board was not bound by the agreement, but made its own findings. Here the circumstance is to the contrary. The recommendations of the conference are final upon the commission. To place such powers in an unofficial, unnamed board or conference, as was done here, would not

constitute a practicable standard of action to guide the administrative officers.

The effect of the act under consideration here is to delegate to a named board the right to delegate to an unnamed board the powers of the Legislature, so far as the question of minimum wages is concerned. Although certain powers of fact finding are to be exercised by the commission to determine the necessity for the fixing of the wage scale—a sort of jurisdictional finding, so to speak—the law clearly states that it is the recommendation of the unnamed body that determines the rate. None of the cases of this court has ever upheld such an unreserved delegation of authority or permitted such "unfettered discretion." Conceivably the conference which recommends need not even consider the evidence from which the commission made its deductions. The commission's preliminary finding may be based upon conditions, places, situations, or admissions which may not be considered by the conference. The authority given the commission to approve or disapprove the conference report does not demand that its action be based upon its consideration of the report in connection with the evidence before it. It may be inferred that it will, but it is certainly not so compelled. Its discretion is unfettered. (Panama Refining Co. v. Ryan, supra.)

There is yet another reason why the act should not stand. Proper procedure for the safeguard of the constitutional rights of the parties is not provided for and made mandatory. The commission is not required to receive evidence upon which the recommendations of the conference are based and to preserve the same. Since the obligatory orders are based upon the findings or recommendations of the conference and are not the result of the actual findings of the commission upon the evidence actually received and preserved, the statute furnishes no adequate means to the parties whereby they may protect themselves against an undue interference with their liberty of contract. Full opportunity of judicial review is not provided for. Appeal is allowed upon questions of law alone. This would ordinarily afford to the parties an opportunity for judicial review of the orders. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U. S. 1. But, in the absence of the evidence, judicial review of all questions of law is impossible. One of those questions is whether the obligatory order is supported by sufficient evidence. Without the evidence the review cannot be complete. Failing in this, the statute upon its face would authorize the commission to violate the due process clause of the State and Federal Constitutions. Fact-finding administrative officers, whose orders issued pursuant to alleged police powers will alter or take away constitutional rights, must base their actions upon proper evidence. Where their conclusions are made final as to the facts, their orders will, nevertheless, be set aside on review unless supported by the evidence. Federal Trades Com. v. Curtis Pub. Co., 260 U. S. 568, 43 S. Ct. 210. Failure to require a record of the evidence defeats opportunity for judicial review and annuls the statute. In this respect the statute here attempts to delegate purely arbitrary power and is unconstitutional. Neither on appeal as provided nor by independent action in equity would the parties have fair opportunity for relief against the commission's orders. There would be no evidence present or available to show the grounds upon which such orders were based, and none can be supplied, for the commission's action is made final as to the facts.

The Supreme Court of the United States, in Southern Ry. Co. v. Virginia, 290 U. S. 190, 54 S. Ct. 148, had under consideration a very similar situation arising under a statute of Virginia pertaining to the regulation of railway crossings. Speaking through Mr. Justice McReynolds, the court said:

"This court has often recognized the power of a state, acting through an executive officer or body, to order the removal of grade crossings; but in all these cases there was the right to a hearing and review by some court. * * *

"After affirming appellant's obligation to comply with the commission's order, the court below said: 'The railroad is not without remedy. Should the power vested in the Highway Commissioner be arbitrarily exercised, equity's long arm will stay his hand.' But, by sanctioning the order directing the railway to proceed, it, in effect, approved action taken without hearing, without evidence, without opportunity to know the basis therefor. This was to rule that such action was not necessarily 'arbitrary.' There is nothing to indicate what that court would deem arbitrary action or how this could be established in the absence of evidence or hearing. In circumstances like those here disclosed, no contestant could have fair opportunity for relief in a court of equity. There would be nothing to show the grounds upon which the commissioner based his conclusion. He alone would be cognizant of the mental processes which begot his urgent opinion.

"The infirmities of the enactment are not relieved by an indefinite right of review in respect of some action spoken of as arbitrary. Before its property can be taken under the edict of an administrative officer, the appellant is entitled to a fair hearing upon the fundamental facts. This has not been accorded. * * *"

Here the act undertakes to empower the unnamed members of an unofficial conference to destroy the liberty of contract under the guise of police powers with nothing of record to indicate the grounds upon which such conference based its conclusions, leaving wholly in darkness the factual basis of the resulting orders of the commission. The act does not accord a fair judicial hearing upon the fundamental facts; there is no adequate way open for the determination of the question of law whether the facts support the orders.

In my opinion, the statute does not fully protect the parties as citizens of the United States . against abridgment by the state of their fundamental privileges and immunities without due process of law as guaranteed by the 14th Amendment. (Southern Ry. Co. v. Virginia, supra.)

The sections of the statute under consideration in this case are substantially the same as are found in the wage and hour law of the state of Washington. I am aware that the Supreme Court of that state has held the act constitutional. Larsen v. Rice, 171 P. 1037; Spokane Hotel Co. v. Younger, 194 P. 595.

In the Larsen Case the particular constitutional questions considered are not revealed. The court merely states that as to those questions it would willingly rest its judgment upon the decisions of the Supreme Court of Oregon wherein the constitutional questions were resolved in favor of a similar act of that state. Stettler v. O'Hara, 139 P. 743; Simpson v. O'Hara, 141 P. 158.

In the Spokane Hotel Case the constitutional question was due process. The employer contended that, since the statute failed to provide for notice of the hearings of the commission, it violated the provision that "No person shall be deprived of life, liberty, or property without due process of law." The court justified denial of notice upon the ground that "employers have no vested right to employ women or minors, and therefore are not entitled to notice as a matter of right" in hearings had pursuant to police power regulations. Whether

or not that statement is correct is not material here. I am not considering the question of due process from the standpoint of failure of notice.

Looking to the Oregon case of Stettler v. O'Hara, supra, it is observed that the holding of the court there with reference to the question of improper delegation of legislative power by the statute is embodied in the following words of the opinion: "Neither does it delegate legislative power to the commission. It is authorized only to ascertain facts that will determine the localities, businesses, hours, and wages to which the law shall apply." The statute here under consideration did attempt to delegate legislative powers, and for that reason is unconstitutional. I cannot agree that an authorization to an administrative board to designate the businesses to which the law shall apply is not a legislative function. I therefore prefer not to follow the Oregon authority, if, in fact, it may be said to be in point.

The case of Simpson v. O'Hara, supra, follows the Stettler Case, and contains no discussion of the question of delegated legislative powers. It merely holds that the Oregon statute does not violate that portion of the 14th Amendment to the Federal Constitution which provides that "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." The opinion does not explain why the statute fails to violate said constitutional provision except to say that "local self-government lies at the very foundation of freedom, and the private and local affairs of a community are sacred from the interference of the central power, unless oppressive and unreasonable encroachment on the liberties of the citizen renders such interference imperatively necessary, and such is not the case here." I do not know what particular provisions of the statute were attacked in the two Oregon cases, except, in the first case, Stettler v. O'Hara, the plaintiff contended "that the statute is void for the reason that it makes the findings of the commission on all questions of fact conclusive, and therefore takes his property without due process of law." The court properly held that the denial of the right to appeal did not violate the due process clause, citing as authority Louisville & N. R. R. Co. v. Garrett, 231 U. S. 298, 34 S. Ct. 48. But in the last-cited case, the court recognized the right of an aggrieved party to go to the courts for a review of all questions of

law in connection with administrative orders.

Mere failure to provide for appeal will not invalidate such statutes; judicial review will not be denied in cases of that character, but a statute which by its terms makes full judicial review of an administrative order a practical impossibility is invalid as a denial of due process. Southern Ry. Co. v. Virginia, supra.

The two Oregon cases, supra, were taken to the Supreme Court of the United States, where they were affirmed without opinion by an equally divided court, one of the justices not participating (243 U. S. 629, 37 S. Ct. 403).

I do not know the exact nature of the questions before the United States Supreme Court in that case. I must assume that the court was called upon to say whether the denial of appeal on questions of fact would prevent judicial review, and whether the abridgment of the privilege of contract was unwarranted under the police power as applied in Oregon, resulting in denial in either case of due process. I am unable to discover any other specific federal questions in the Oregon cases. And I am not concerned with them here; I do not say that the denial of right to appeal denies due process; neither do I say that the police power of the state may not in some degree extend to actual abridgment of the right to contract on the part of employer and employee.

Again, in West Coast Hotel Co. v. Parrish, 300 U. S. 379, 81 L. Ed. 703, 57 S. Ct. 578 (appealed from Supreme Court of Washington, 55 P.2d 1083), the Washington statute came before the Supreme Court of the United States. There the only issue (except that of arbitrary discrimination) was deprivation of freedom of contract. It was held that the statute was not violative of the 14th Amendment in that respect so far as women and minor employees were concerned. I am not concerned here with the question of illegal abridgment of the freedom of contract.

I think the judgment should be reversed and the cause remanded, with directions to issue the writ.

I am authorized to say that Mr. Justice WELCH concurs in these views.